MARY E. ALEXANDER, ESQ. (SBN: 104173)
Mary Alexander & Associates, P.C.
44 Montgomery Street, Suite 1303
San Francisco, California 94104
Telephone: (415) 433-4440
Facsimile: (415) 433-5440
Email: malexander@maryalexanderlaw.com

ELIZABETH J. CABRASER (SBN: 083151)
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
Email: ecabraser@lchb.com

GRETCHEN NELSON (SBN: 112566)
Nelson & Fraenkel LLP
601 So. Figueroa Street, Suite 2050
Los Angeles, CA 90017
Telephone: (213) 622-6469
Facsimile: (213) 622-6019
Email: gnelson@nflawfirm.com

*Attorneys for Plaintiffs*
[Additional counsel on signature page]

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TIMOTHY LEUENHAGEN; NANCY LEUENHAGEN; JAMES LEMAIRE; HELGA MYLES; MARILYN HAMILTON; CECELIA BOGER; TERRY FRASER; CYNTHIA FRASER; JOAN MCREE; JORDAN LICHTENSTEIN; MARCIA LICHTENSTEIN; J. LESLIE WARNER; WENDY WARNER; MICHAEL PIASECKI; BONNIE PIASECKI; DAVID KNUDSEN; CINDY KNUDSEN; EDWARD LAKE; and ELAINE CARRIGAN, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, | Case No.: 2:21-cv-1187 <br><br> **CLASS ACTION AND INDIVIDUAL COMPLAINT FOR DAMAGES** <br><br> 1. NEGLIGENCE <br> 2. GROSS NEGLIGENCE <br> 3. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS <br> 4. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS <br><br> **DEMAND FOR JURY TRIAL** |

vs.

CARNIVAL CORPORATION;
CARNIVAL PLC and PRINCESS
CRUISE LINES LTD.,

Defendants.

## COMPLAINT AND JURY DEMAND

Individual and representative Plaintiffs TIMOTHY LEUENHAGEN, NANCY LEUENHAGEN, JAMES LEMAIRE, HELGA MYLES, and MARILYN HAMILTON, bring this action for themselves and on behalf of all persons similarly situated, including individual Plaintiffs, CECELIA BOGER, TERRY FRASER, CYNTHIA FRASER, JOAN MCREE, JORDAN LICHTENSTEIN, MARCIA LICHTENSTEIN, J. LESLIE WARNER, WENDY WARNER, MICHAEL PIASECKI, BONNIE PIASECKI, DAVID KNUDSEN, CINDY KNUDSEN, EDWARD LAKE, ELAINE CARRIGAN, and the more than 2,000 passengers who sailed on the roundtrip Motor Vessel ("M/V") GRAND PRINCESS cruise from San Francisco, California on February 21, 2020, to Hawaii, against Defendants, PRINCESS CRUISE LINES LTD. ("PRINCESS"), its parent companies CARNIVAL CORPORATION & CARNIVAL PLC (collectively, "CARNIVAL") and allege:

## THE PARTIES

1.      Individual and representative Plaintiff Timothy Leuenhagen is *sui juris*, and is a resident of Washoe County, Nevada and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

2.      Individual and representative Plaintiff Nancy Leuenhagen is *sui juris*, and is a resident of Washoe County, Nevada and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

3. Individual and representative Plaintiff James Lemaire is *sui juris*, and is a resident of Ormsby County, Nevada and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

4. Individual and representative Plaintiff Helga Myles is *sui juris*, and is a resident of Ormsby County, Nevada and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

5. Individual and representative Plaintiff Marilyn Hamilton is *sui juris*, and is a resident of Calaveras County, California and was a passenger onboard the Grand Princess cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

6. Individual Plaintiff Cecelia Boger is *sui juris*, and is a resident of Oneida County, Wisconsin and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

7. Individual Plaintiff Terry Fraser is *sui juris*, and is a resident of Scugog Township, Ontario, Canada and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

8. Individual Plaintiff Cynthia Fraser is *sui juris*, and is a resident of Scugog Township, Ontario, Canada and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

9. Individual Plaintiff Joan McCree is *sui juris*, and is a resident of Nevada County, California and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

10. Individual Plaintiff Jordan Lichtenstein is *sui juris*, and is a resident of Cook County, Illinois and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

11. Individual Plaintiff Jordan is *sui juris*, and is a resident of Cook County, Illinois and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

12. Individual Plaintiff J. Leslie Warner is *sui juris*, and is a resident of Nipissing Township, Ontario, Canada and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

13. Individual Plaintiff Wendy Warner is *sui juris*, and is a resident of Nipissing Township, Ontario, Canada and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

14. Individual Plaintiff Michael Piasecki is *sui juris*, and is a resident of Lucas County, Ohio and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

15. Individual Plaintiff Bonnie Piasecki is *sui juris*, and is a resident of Lucas County, Ohio and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

16. Individual Plaintiff David Knudsen is *sui juris*, and is a resident of Washington County, Utah and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

17. Individual Plaintiff Cindy Knudsen is *sui juris*, and is a resident of Washington County, Utah and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

CLASS ACTION COMPLAINT

18.     Individual Plaintiff Edward Lake is, *sui juris*, and is a resident of Santa Cruz County, Califronia and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

19.     Individual Plaintiff Elaine Carrigan is, *sui juris*, and is a resident of Santa Cruz County, Califronia and was a passenger onboard the M/V GRAND PRINCESS cruise from February 21, 2020, to disembarkation on or about March 10, 2020.

20.     Defendant CARNIVAL CORPORATION was incorporated in 1972 in Panama and has its headquarters in Miami, Florida.

21.     Defendant CARNIVAL PLC was incorporated in 2000, in Wales, United Kingdom. It also has its headquarters in Miami, Florida.

22.     Upon information and belief, Defendant PRINCESS CRUISE LINES LTD. is incorporated in Bermuda, with its headquarters in Santa Clarita, California.

23.     Upon information and belief, at all times hereto, CARNIVAL CORPORATION, CARNIVAL PLC, and PRINCESS advertised, marketed, sold, and profited (directly or indirectly) from and owned, controlled, and operated the cruise ship, M/V GRAND PRINCESS.

**ALTER EGO/PIERCING CORPORATE VEIL**

24.     Defendants CARNIVAL CORPORATION, CARNIVAL PLC, AND PRINCESS are alter egos and/or agents of each other such that the corporate form should be disregarded.

25.     CARNIVAL CORPORATION and CARNIVAL PLC operate as a single economic enterprise. They share a senior executive management team and identical Boards of Directors. Both CARNIVAL CORPORATION and CARNIVAL PLC share a single headquarters in Miami, Florida. They are one and the same.

CLASS ACTION COMPLAINT

26.     As described by CARNIVAL CORPORATION in a filing with the Securities and Exchange Commission ("SEC"), "Carnival Corporation and Carnival plc operate a dual listed company ('DLC'), whereby the businesses of Carnival Corporation and Carnival plc are combined through a number of contracts and through provisions in Carnival Corporation's Articles of Incorporation and By-Laws and Carnival plc's Articles of Association."

27.     Plaintiffs bring this lawsuit against CARNIVAL CORPORATION and CARNIVAL PLC individually, but because the entities work as alter-egos and/or agents of one another, Plaintiffs refer to them collectively throughout this Complaint as "CARNIVAL."

28.     In the same SEC filings in which CARNIVAL explains the DLC, it also claims a portfolio of cruise brands which it breaks into two segments (1) the North America Segment, which includes PRINCESS, and (2) the Europe Australia and Asia Segment. CARNIVAL represents that, with these two segments, it "operate[s] over 100 cruise ships within a portfolio of leading global, regional and national cruise brands." CARNIVAL further provides details as to the passenger capacity of each of its subsidiary brands, and each brand's respective percentage of the total capacity of CARNIVAL CORPORATION.

29.     CARNIVAL thus represents to the public that it can properly claim the revenues, income, earnings, assets, carrying capacity, employees and vessels operating as PRINCESS CRUISE LINES.

30.     CARNIVAL exercises total domination over PRINCESS, to the extent that Princess manifests no separate corporate interests of its own and functions solely to achieve the purposes of CARNIVAL.

   a.     CARNIVAL and PRINCESS share the same Board of Directors and almost all of the same executive officers, and CARNIVAL and PRINCESS also appear to use the same assets, including the vessel that is the subject of this Complaint.

b.      In fact, in past SEC filings, CARNIVAL has claimed the M/V GRAND PRINCESS as one of its assets. CARNIVAL represents that the M/V GRAND PRINCESS is one of its vessels for the purposes of aggregating CARNIVAL's own worth, financial condition and abilities to the public and in business dealings, allowing it to leverage this value for its own benefit.

c.      CARNIVAL's Group Senior Vice President and Chief Medical Officer, Dr. Grant Tarling, also serves as the Chief Medical Officer for each of CARNIVAL's cruise line brands. In this role, Dr. Tarling provided multiple messages to the public on behalf of PRINCESS and CARNIVAL through YouTube and Facebook, regarding the status of the M/V DIAMOND PRINCESS and about safety measures PRINCESS and CARNIVAL claimed to implement on PRINCESS ships.[1]

d.      CARNIVAL also claims for itself all of PRINCESS's purported rights, exemptions from liability, defenses, and immunities included in PRINCESS's Passage Contract, despite not being a signatory to the Passage Contract.

e.      CARNIVAL determines the bonuses paid to executives of its cruise line brands, including PRINCESS, through its Management Incentive Plan. Bonuses paid to executives of CARNIVAL's cruise line brands are determined both by whether the executive's cruise line brand met its "Brand Operating Income Target" and by whether CARNIVAL met its company-wide "Corporation Operating Income Target."

f.      CARNIVAL promulgated Health, Environmental, Safety, and Security (HESS) policies for all of its cruise line brands, including PRINCESS.

---

[1] *See*, *e.g.*, Diamond Princess Update: Dr. Grant Tarling, February 13, 2020, https://www.facebook.com/PrincessCruises/videos/203765767439746/ (last visited August 14, 2020); Dr. Grant Tarling Medical Update with Enhanced Screening and Preventive Health Measures, February 29, 2020, https://www.youtube.com/watch?v=kSOuXwmh9Lo (last visited August 14, 2020).

CLASS ACTION COMPLAINT

1   CARNIVAL's HESS Corporate Policy states that CARNIVAL will "ensure
2   compliance with this [HESS] policy within each of Carnival's Corporate and
3   Operating Line organizations."[2]

4           g.      In 2018, CARNIVAL implemented a HESS event reporting
5   platform to "standardize HESS event reporting and analysis capabilities across our
6   entire fleet."[3]

7       31.    In 2016, PRINCESS agreed to plead guilty to federal felony charges
8   stemming from its illegal dumping of oil-contaminated bilge waste into the seas and
9   intentional acts to cover it up. In its plea agreement, PRINCESS agreed to pay a
10  $40 million penalty—the largest criminal penalty ever involving deliberate vessel
11  pollution. Though CARNIVAL was not a defendant in the action, CARNIVAL
12  signed the plea agreement and bound itself to its terms.

13      32.    The plea agreement noted that CARNIVAL "currently monitors and
14  supervises environmental, safety, security, and regulatory requirements for Princess
15  and other Carnival brands." Prior to the government investigation that led to the
16  plea agreement, CARNIVAL had "undertaken steps to strengthen and enhance its
17  oversight and compliance structure." For example, "the company initiated structural
18  changes within its management organization, primary among which was the
19  creation of a position titled 'Chief Maritime Officer,' placing the responsibility for
20  overall environmental, safety, and security compliance in one individual …."

21      33.    The plea agreement required CARNIVAL to fund and implement an
22  Environmental Compliance Plan ("ECP") across all of its brands, not just
23  PRINCESS. The ECP required CARNIVAL to designate a Corporate Compliance
24  Manager ("CCM") who was to "have overall responsibility for the implementation

25  _____
26  [2] Carnival Corporation & PLC Health, Environmental, Safety, Security, and
     Sustainability Corporate Policy, https://www.carnivalcorp.com/static-
     files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited September 30, 2020).
27  [3] Sustainability from Ship to Shore, Carnival Corp. & PLC FY2018 Sustainability
28  Report, https://safety4sea.com/wp-content/uploads/2019/06/Carnival-Corp.-
     Sustainability-From-Ship-to-Shore-2019_06.pdf (last visited September 30, 2020).

of[the] ECP" and "authorized to access all records, documents, facilities, and vessels, including all spaces within vessels necessary to perform their function, throughout CARNIVAL for the purpose of implementing [the] ECP."

34.     In 2019, the U.S. sought to revoke PRINCESS's probation for violating the terms of the ECP. The court in that case required members of the Executive Committee of the CARNIVAL Board of Directors (including the CEO and Chairman) be present at the revocation hearing.

35.     PRINCESS and CARNIVAL admitted to violating probation by failing to fully implement the ECP. In the settlement agreement for those violations, CARNIVAL agreed to issue a statement to all employees across all of its brands stating that CARNIVAL's CEO "personally accepts management responsibility for the probation violations …." As part of the settlement, CARNIVAL agreed to submit "an action plan for restructuring its corporate compliance functions, which includes creating a new Ethics and Compliance Department at All Brands Group that is part of a broader Ethics and Compliance Program that extends throughout the brands/operating lines; …."  The settlement agreement was signed "on behalf of Defendant" by three members of the "Executive Committees of the Boards of Directors of Carnival Corporation and Carnival plc," but no representatives of PRINCESS.

36.     Also in 2019, CARNIVAL announced that it was creating a new Chief Ethics and Compliance Officer "to further develop our ethics and compliance program across the entire corporation." CARNIVAL explained that "[i]t is important to note that the Ethics & Compliance is not just a single department within  All Brands Group – but rather a corporate-wide program – with key Ethics & Compliance Officers . . . who help shape and implement the program initiatives in each of the operating companies."

37.     In March 2020, CARNIVAL announced that it was implementing a temporary pause of cruise operations across all of its brands, including PRINCESS,

CLASS ACTION COMPLAINT

1   as a result of the COVID-19 pandemic. To address the costs of this temporary pause

2   to its operations, the CEO of CARNIVAL wrote a message to all of the employees

3   of CARNIVAL and its subsidiary brands, stating: "I've directed our brand leaders

4   to reduce or eliminate non-critical cash expenditures, but of course never cutting

5   anything that would impact compliant, environmentally sound and safe operations."

6     38. In September 2020, CARNIVAL announced the sale of two of its

7   cruise ships, the Sun Princess and the Sea Princess. PRINCESS announced that it

8   was selling the ships because the sale "is in line with parent company Carnival

9   Corporation's plan to accelerate the removal of less efficient ships from its fleet."[4]

10     39. As demonstrated above, CARNIVAL has ownership and control over

11   PRINCESS, and CARNIVAL exerts control and domination over PRINCESS's

12   business and day-to-day operations. Plaintiffs believe that further discovery will

13   reveal the full extent of this control.

14     40. Given CARNIVAL's control of operations and co-mingling of assets

15   with PRINCESS—both of which can be more fully established through

16   discovery—the corporate form should be disregarded here. Failure to do so would

17   thwart the interests of justice by allowing CARNIVAL to, on one hand, claim the

18   M/V GRAND PRINCESS as a part of its holdings, but then, on the other hand,

19   disclaim responsibility for that vessel and the passengers traveling on it.

20            **JURISDICTION**

21     41. This Court has Admiralty subject matter jurisdiction pursuant to 28

22   U.S.C. § 1333 as this case involves a maritime tort. The type of incident and

23   injuries suffered by Plaintiffs and the class had the potential to impact maritime

24   commerce as Plaintiffs and the class suffered harm and Plaintiffs and the class were

25

26   _____

27   [4] Princess Press Release, Sun Princess and Sea Princess to Leave Princess Cruises
Fleet, (Sept. 21, 2020),

28   https://www.princess.com/news/notices_and_advisories/notices/sun-and-sea-
princess-to-leave-princess-cruises-fleet.html (last visited Oct. 1, 2020).

CLASS ACTION COMPLAINT

1    and continue to be at serious risk of imminent harm as a result of exposure to
2    COVID-19 aboard the cruise ship upon which they were paying passengers.

3        42.    This Court also has subject matter jurisdiction pursuant to the Class
4    Action Fairness Act, codified at 28 USC §1332(d)(2)(A) and (C), because the
5    claims of the proposed Class Members exceed $5,000,000, and because at least one
6    member of the Proposed Class of plaintiffs is a citizen of a state different from at
7    least one Defendant. Further, this court has jurisdiction over the claims of certain
8    individual Plaintiffs under 28 U.S.C. § 1332 because the amount in controversy
9    exceeds seventy-five thousand dollars ($75,000), as to each of the individual
10   Plaintiffs and Plaintiffs are citizens of a different state than the Defendants.

11       43.    This Court has personal jurisdiction over Defendants, who each
12   conduct substantial business in this district.

13       44.    Defendant PRINCESS has its headquarters in Santa Clarita, California.
14       45.    Upon information and belief, CARNIVAL, including by and through
15   its subsidiary, PRINCESS, markets cruise vacations to California residents and
16   employs thousands of California residents to work at its California headquarters.
17   The Court has personal jurisdiction over CARNIVAL because CARNIVAL is
18   authorized to do business in California, conducts substantial business in California,
19   and some of the actions giving rise to this Complaint took place in California.

20       46.    The claims asserted herein arise from Defendants' contacts with
21   California.

22       47.    Additionally, the Passage Contract purports to name the Central
23   District as a proper venue to actions against the Defendants. Although Plaintiffs do
24   not concede the enforceability of the Passage Contract, by naming this District as a
25   proper venue, Defendants have consented to personal jurisdiction in this District.

26       48.    Each of the facts pleaded herein independently, but also all of these
27   facts together, are sufficient to render the exercise of jurisdiction by this Court over
28   Defendants permissible under traditional notions of fair play and substantial justice.

CLASS ACTION COMPLAINT

**VENUE**

49.     Venue in the Central District of California is proper under 28 U.S.C. § 1391 because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction.

50.     Additionally, without conceding the enforceability of the Passage Contract, Plaintiffs acknowledge the inclusion in the Passage Contract of a venue selection provision designating the United States District Court for the Central District of California in Los Angeles as a proper venue for this action.

**FACTUAL ALLEGATIONS**

**I.      COVID-19, Its Symptoms, and Long-Term Effects**

51.     In December 2019, a new strain of Coronavirus known as COVID-19 or SARS-CoV-2 was first reported as having been diagnosed in humans in China. The virus quickly spread through China and Asia and has caused a global pandemic.

52.     On January 20, 2020, the United States Centers for Disease Control and Prevention ("CDC") announced the first confirmed case in the U.S. Ten days later, on January 30, 2020, the CDC announced that it had identified, in Illinois, the first known instance of person-to-person spread (i.e. not related to travel outside of the United States).

53.     Also on January 30, 2020, the World Health Organization ("WHO") declared COVID-19 a "Public Health Emergency of International Concern." According to WHO, a Public Health Emergency of International Concern is "an extraordinary event which is determined to constitute a public health risk to other States through the international spread of disease and to potentially require a coordinated international response."

CLASS ACTION COMPLAINT

54.     On January 31, 2020, the U.S. Secretary for Health and Human Services declared a public health emergency for "the entire United States to aid the nation's healthcare community in responding" to COVID-19.[5]

55.     There are currently over 27 million confirmed cases of COVID-19 in the United States, and over 465,000 people have died of the virus in the U.S. The death toll worldwide is reported to be more than 2.3 million out of more than 107 million confirmed cases.

56.     The full scope of the impact of this pandemic remains unknown, as reports have indicated that the numbers of cases and deaths may be significantly undercounted.[6] One reason for this undercounting is due to the unavailability and inaccuracy of COVID-19 diagnostic tests in the United States, particularly during the early days of the pandemic.[7] Indeed, the initial test designed by the CDC contained critical flaws, and the process of developing a more accurate test delayed widespread availability of COVID-19 tests by weeks.[8]

---

[5] Secretary Azar Declares Public Health Emergency for United States for 2019 Novel Coronavirus (Jan. 31, 2020), https://www.hhs.gov/about/news/2020/01/31/secretary-azar-declares-public-health-emergencyus-2019-novel-coronavirus.html (last visited Sept. 30, 2020).

[6] Berkeley Lovelace Jr., *Official U.S. coronavirus death toll is 'a substantial undercount' of actual tally, Yale study finds*, CNBC, July 1, 2020, https://www.cnbc.com/2020/07/01/official-us-coronavirus-death-toll-is-a-substantial-undercount-of-actual-tally-new-yale-study-finds.html (last visited August 12, 2020); Apoorva Mandavilli, *Actual Coronavirus Infections Vastly Undercounted, C.D.C. Data Shows*, New York Times, June 27, 2020 (updated August 6, 2020), https://www.nytimes.com/2020/06/27/health/coronavirus-antibodies-asymptomatic.html (last visited August 12, 2020).

[7] *See* Olga Khazan, The 4 Key Reasons the U.S. Is So Behind on Coronavirus Testing, The Atlantic, March 13, 2020, https://www.theatlantic.com/health/archive/2020/03/why-coronavirus-testing-us-so-delayed/607954/ (last visited August 12, 2020).

[8] Caroline Chen, Marshall Allen, Lexi Churchill, and Isaac Arnsdorf, *Key Missteps at the CDC Have Set Back Its Ability to Detect the Potential Spread of Coronavirus*, ProPublica, February 28, 2020, https://www.propublica.org/article/cdc-coronavirus-covid-19-test.

CLASS ACTION COMPLAINT

57.     Once testing became more widely available—though still not accessible to all those in need—it was, and has remained, inaccurate. In particular, experts warn of false negatives.[9] For instance, one San Francisco resident who traveled on Defendants' ship the DIAMOND PRINCESS reported taking over a dozen COVID-19 tests during a month-long period. The tests returned alternating results of positive and negative.[10]

58.     The concern that negative test results could not be trusted led experts to advise those exposed to COVID-19 to quarantine for 14 days, *even if they tested negative for the virus*. Indeed, as described in more detail below, Defendants and the federal government required Plaintiffs in this case to participate in a two-week quarantine on military bases, and advised that they should do so regardless of a negative test.[11]

59.     Despite the likely drastic undercounting of case and death statistics, the numbers make abundantly clear that COVID-19 spreads swiftly, and poses grave risks to individuals exposed to it.

60.     The means by which the virus spreads are varied, and not yet fully known. Studies tend to show that the virus can be transmitted through person-to-person contact[12], but also through air flow, and on surfaces.[13] In particular, recent

---

[9] Lisa M. Krieger, Coronavirus false tests results: With a push to screen come questions of accuracy, The Mercury News, March 19, 2020, https://www.mercurynews.com/2020/03/19/coronavirus-false-test-results-with-the-push-to-screen-come-questions-of-accuracy/ (last visited August 12, 2020).

[10] *Id.*

[11] *Id.*

[12] Centers for Disease Control, How COVID-19 Spreads, Updated June 16, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited August 12, 2020).

[13] *Id.*; *see also* Apoorva Mandavilli, *A Smoking Gun': Infection Coronavirus Retrieved From Hospital Air*, August 11, 2020, https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html (last visited August 12, 2020); Joshua L. Santarpia, et al., *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care,* Nature Research Scientific Reports (2020) 10:127732,

CLASS ACTION COMPLAINT

studies have indicated that spaces without poor or limited ventilation can cause greater accumulation of the airborne virus because of the presence of aerosolized droplets that can cause transmission.[14]

61.     Likewise, the length of time that the virus can survive on surfaces remains unclear. But at least one study indicates that items with repeated and/or prolonged contact—such as a phone or television remote control—can carry the virus. The same study also showed the virus present on surfaces, such as floors and window sills, that were untouched by any patient, but which were in the stream of air flow in the patient's room.[15] Another study suggests that transmission is possible through shared elevator buttons.[16]

62.     The virus has an incubation period believed to be approximately 14 days,[17] but many of the ailments associated with COVID-19 persist for weeks and, in some instances, months.[18]

---

https://www.nature.com/articles/s41598-020-69286-3

[14] Apoorva Mandavilli, *A Smoking Gun': Infection Coronavirus Retrieved From Hospital Air*, August 11, 2020, https://www.nytimes.com/2020/08/11/health/coronavirus-aerosols-indoors.html (last visited August 12, 2020)

[15] Joshua L. Santarpia, et al., *Aerosol and surface contamination of SARS-CoV-2 observed in quarantine and isolation care,* Nature Research Scientific Reports (2020) 10:127732, https://www.nature.com/articles/s41598-020-69286-3

[16] Aylin Woodward, *As asymptomatic coronavirus carrier infected an apartment neighbor without sharing the same space. A study blames the building's elevator buttons.*, Business Insider, July 5, 2020, https://www.businessinsider.com/coronavirus-jumped-between-people-via-elevator-surfaces-study-2020-7 (last visited August 12, 2020).

[17] Centers for Disease Control, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), Updated June 30, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited August 12, 2020).

[18] Mark W. Tenforde, et al., *Symptom Duration and Risk Factors for Delayed Return to Usual Health Among Outpatients with COVID-19 in a Multistate Health Care Systems Network –United States, March-June 2020*, Morbidity and Mortality Weekly Report, July 31, 2020, https://www.cdc.gov/mmwr/volumes/69/wr/mm6930e1.htm (last visited August 12, 2020).

CLASS ACTION COMPLAINT

63.     The full extent and longevity of the virus's effects on the human body also remain unclear and—because of the virus's novelty—largely unstudied. The research that has been conducted suggests that exposure to and contraction of COVID-19 leads to a wide range of medical outcomes, from a mild cough and/or sore throat to sustained cardiac, kidney, liver, neurological, respiratory, and circulatory damage.[19] And, as shown by the statistics reported above, many patients die as a result of contracting the virus.

64.     COVID-19 is sometimes associated with symptoms such as:  fever, cough, shortness of breath, body and muscle aches, and loss of taste and smell. The virus manifests differently, however, in different patients, striking some with brutal swiftness and others with more mild symptoms. Some people who contract the virus have a fever; others do not. Some suffer from extreme fatigue; others do not. Some report having a sore throat; others do not.[20] Some COVID patients never display any of these "typical" symptoms and instead experience COVID-19 as more of a stomach virus, experiencing diarrhea and/or vomiting. Others never experience gastro-intestinal distress. Still, some people test positive for the virus while appearing to be entirely asymptomatic, with no symptoms whatsoever,[21] or only later develop effects from the virus.

65.     The multiple presentations of the disease made it difficult for a patient to immediately attribute their symptoms to COVID-19, especially in the early days of the pandemic, before the general public and treating physicians became more informed as to how the myriad manifestations of the disease.

_____

[19] Tara Parker-Pope, *The Many Symptoms of Covid-19*, The New York Times, August 5, 2020, https://www.nytimes.com/2020/08/05/well/live/coronavirus-covid-symptoms.html (last visited August 12, 2020).

[20] Centers for Disease Control, Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19), Updated June 30, 2020, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last visited August 12, 2020).

[21] *Id.*

CLASS ACTION COMPLAINT

66.     In addition to—and sometimes separate from—the symptoms described above, the virus can also wreak havoc on patients' organs. COVID-19 can cause heart and liver failure, kidney damage, neurological deficits, and blood clots that can lead to severe and/or multiple strokes and limb amputation.[22]

67.     Research thus far has shown that patients who are believed to have "recovered" from COVID-19 continue to suffer life-altering and potentially life-threatening health problems.[23] For instance, one study found that at approximately 71 days after a positive COVID-19 test, irrespective of the severity of the patient's symptoms, the time of the original diagnosis, and any pre-existing conditions, 60% of patients evaluated showed signs of "ongoing myocardial inflammation." The same study discovered that 78% of patients demonstrated "cardiac involvement"— that is, these patients had abnormal cardiac readings associated with bad outcomes for cardio-myopathies.[24]

68.     Additionally, some patients who initially experience only mild symptoms (or no symptoms) later suffer catastrophic damage, such as stroke,[25] severe blood clots,[26] and/or cardiac inflammation like that described above.

---

[22] Lenny Bernstein, Carolyn Y. Johnson, Sarah Kaplan and Laurie McGinley. *Coronavirus destroys lungs. But doctors are finding its damage in kidneys, hearts, and elsewhere.* The Washington Post. April 15, 2020. https://www.washingtonpost.com/health/coronavirus-destroys-lungs-but-doctors-are-finding-its-damage-in-kidneys-hearts-and-elsewhere/2020/04/14/7ff71ee0-7db1-11ea-a3ee-13e1ae0a3571_story.html (last visited April 29, 2020).

[23] *See*, *e.g.*, Diana Lindner, et al., Association of Cardiac Infection With SARS-CoV-2 in Confirmed COVID-19 Autopsy Cases, JAMA Cardiology, July 27, 20202, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768914 (finding "virus progeny" in the heart of autopsied COVID-19 patients).

[24] Valentina O. Puntmann, et al., Outcomes of Cardiovascular Magnetic Resonance Imaging in Patients Recently Recovered From Coronavirus Disease 2019 (COVID-19), JAMA Cardiology, July 27, 2020, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916 (last visited August 12, 2020).

[25] Ariana Eunjung Cha, Y*oung and middle-aged people, barely sick with covid-19 are dying of strokes*, The Washington Post, April 25, 2020, https://www.washingtonpost.com/health/2020/04/24/strokes-coronavirus-young-patients/ (last visited August 12, 2020).

CLASS ACTION COMPLAINT

69.    And some people contract and carry the virus without manifesting or experiencing any initial symptoms. Researchers have reported that even these "asymptomatic" patients may in fact suffer long-term and/or later-manifesting harms, such as severe cardiac damage including myocarditis and arrhythmias.[27]

70.    Such occurrences were described by Dr. Jon Drezner, Director of the University of Washington Medicine Center for Sports Cardiology in Seattle, team physician for the Seattle Seahawks, Seattle Reign, and University of Washington Huskies, and advisor to the NCAA on cardiac issues, on an August 11, 2020 CNN broadcast. Drezner explained that "early on in the pandemic we learned that COVID-19 can affect the heart. And about one in four hospitalized have heart injury and raised a lot of questions and concerns about patients who weren't in the hospital."  He continued by posing the question: "Would patients who have mild symptoms or no symptoms have heart injury?" and further explained that, "More recently we've been learning that some college and professional athletes are inflicted with myocarditis (inflammation of the heart which can trigger arrhythmia or cardiac arrest) from COVID-19."

71.    Dr. Drezner confirmed that this potentially long-term damage can afflict someone who was asymptomatic or who experienced only a mild case of COVID-19 that did not require hospitalization. He said:  "We are learning that some athletes who really had no symptoms and go through subsequent testing are being diagnosed with myocarditis[,]" which is, in his words:  "inflammation of the

---

[26] Tara Parker-Pope, *The Many Symptoms of Covid-19*, The New York Times, August 5, 2020, https://www.nytimes.com/2020/08/05/well/live/coronavirus-covid-symptoms.html (last visited August 12, 2020).

[27] Carolyn Barner, *COVID-19 Can Wreck Your Heart, Even if You Haven't Had Any Symptoms*, Scientific American, August 31, 2020, https://www.scientificamerican.com/article/covid-19-can-wreck-your-heart-even-if-you-havent-had-any-symptoms (last visited September 30, 2020).

CLASS ACTION COMPLAINT

heart muscle and it can lead to scar tissue in the heart.  And that scar tissue can be a focus for arrhythmia or even sudden cardiac arrest."[28]

72.     Likewise, a study that considers, among other things, the lingering impact of the virus on those with mild symptoms is currently underway at the University of California, San Francisco. Among the study's findings is that children exposed to "adult relatives with flu-like symptoms" developed signs of Kawasaki disease, including lesions  on their feet and hands, *weeks or months* after that exposure.[29]

73.     Together, the multiple presentations of the virus, range of severity of symptoms—from asymptomatic to severe—the unavailability and inaccuracy of testing, along with the limited research about COVID-19 make it plausible that a person directly exposed to the virus, particularly for prolonged periods of time, like the passengers on the M/V GRAND PRINCESS, will suffer long-lasting, and potentially life-altering or fatal health effects.

74.     As a result and a proximate cause of Defendants PRINCESS and CARNIVAL exposing Plaintiffs to COVID-19 aboard the M/V GRAND PRINCESS, as described in more detail below, and because of the nature of the virus and its long-term health effects, Plaintiffs will require medical monitoring and diagnostic examinations into the future. This monitoring is required to diagnose, prevent, and/or treat current or future injury related to Plaintiffs' and Class members' exposure to, contraction of, illness and disease related to, asymptomatic contraction of, and potential contraction of COVID-19, in light of the evolving

---

[28] Interview on CNN Anderson Cooper 360 August 11, 2020, transcript available at: http://transcripts.cnn.com/TRANSCRIPTS/2008/11/cnr.10.html

[29] Peter Fimrite, *Long after the illness is gone, damage from coronavirus may remain*, San Francisco Chronicle, May 31, 2020, https://www.sfchronicle.com/health/article/Long-after-the-illness-is-gone-the-damage-from-15305842.php?utm_campaign=CMS%20Sharing%20Tools%20(Premium)&utm_source=share-by-email&utm_medium=email (last visited August 13, 2020)

scientific understanding of the full risk and scope of health outcomes related to and/or resulting from the virus.

## II.   Carnival and Princess Knew or Should Have Known the Risks of Viral Contagion Aboard Their Cruise Ships.

75.     In early February 2020, experts in the European Union, led by epidemiologist Dr. Christou Hadjichristodoulou, released specific guidelines for the cruise industry that included an outline of the risk of COVID-19 outbreaks aboard cruise ships and recommended response protocols.[30] Specifically, the guidelines directed that, in the event of a COVID-19 case, "close contacts" of the individuals believed to have COVID-19 should be quarantined in their cabin or on shore, and "casual contacts" should be disembarked from the ship.[31]

76.     On February 12, 2020, the CDC issued guidance for ships on managing COVID-19.[32] The guidance noted that commercial shipping, including cruise ships, "involves the movement of large numbers of people in closed and semi-closed settings. Like other close-contact environments, ships may facilitate transmission of respiratory viruses from person to person through exposure to respiratory droplets or contact with contaminated surfaces." The guidance

_____

[30] Interim Advice for Preparedness and Response to Cases of Acute Respiratory Disease at Points of Entry in the European Union (EU) / EEA Member States (MS): Advice for ship operators for preparedness and response to the outbreak of 2019-nCoV acute respiratory disease, Feb. 3, 2020, https://www.gac.com/491364/siteassets/about-gac/coronavirus/eu-interim-advice_2019-ncov_maritime_4_2_2020_f.pdf (last visited April 6, 2020); *see also* Matt Apuzzo, Motoko Rich and David Yaffe-Bellany, *Failures on Diamond Princess Shadow Another Cruise Ship Outbreak*, The New York Times, March 8, 2020, https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html (last visited April 6, 2020).

[31] Healthy GateWays, Algorithm for decision making in response to an event of a suspect case of COVID-19, https://www.nytimes.com/2020/03/08/world/asia/coronavirus-cruise-ship.html (last visited April 6, 2020).

[32] Interim Guidance for Ships on Managing 2019 Novel Coronavirus, Feb. 12, 2020 (updated Feb. 15), https://www.cdc.gov/quarantine/maritime/recommendations-for-ships.html (last visited Sept. 30, 2019).

CLASS ACTION COMPLAINT

recommended "[i]dentifying and isolating passengers and crew with possible symptoms of COVID-19 as soon as possible." It also recommended that "[p]assengers and crew members who have had high-risk exposures to a person suspected of having COVID-19 should be quarantined in their cabins."

77.     In or before early February 2020, Defendants became aware of an outbreak of COVID-19 aboard the cruise ship the DIAMOND PRINCESS, which is owned and/or operated by CARNIVAL and PRINCESS. The outbreak originated on the DIAMOND PRINCESS while the vessel was docked in Yokohama, Japan. Ten cases were originally diagnosed, and that number rapidly escalated to over 700 cases—over one-fifth of the passengers and crew members onboard the ship at the time. Investigative reporting about the DIAMOND PRINCESS revealed that well after CARNIVAL and PRINCESS became aware of the first case aboard the ship, Defendants worked to "keep the fun going" by "encouraging [guests] to mingle."[33]

78.     To date, at least 14 of the DIAMOND PRINCESS's passengers have died as a result of COVID-19.[34] At least two of these fatalities occurred before February 19, 2020.[35]

79.     In a February 18, 2020, update issued in response to the crisis aboard the DIAMOND PRINCESS, the CDC stated that "the rate of new reports of positives [now] on board, especially among those without symptoms, highlights the high burden of infection on the ship and potential for ongoing risk."[36]

[33] Austin Carr and Chris Palmieri, *Socially Distance This: Carnival Executives Knew They Had a Virus Problem, But Kept the Party Going*, Bloomberg, April 16, 2020,  https://www.bloomberg.com/features/2020-carnival-cruise-coronavirus/ (last visited April 20, 2020).

[34] Lauren Smiley, *27 Days in Tokyo Bay: What Happened on the Diamond Princess*, Wired, May 13, 2020, https://www.wired.com/story/diamond-princess-coronavirus-covid-19-tokyo-bay/.

[35] *See* The New York Times, *Japan Reports 2 Deaths Among Cruise Ship Passengers*, Feb. 19, 2020, https://www.nytimes.com/2020/02/19/world/asia/china-coronavirus.html (last visited April 6, 2020).

[36] *See* Centers for Disease Control and Prevention, Update on the Diamond Princess Cruise Ship in Japan, Feb. 18, 2020,

CLASS ACTION COMPLAINT

80.     Upon information and belief, in February 2020, CARNIVAL and PRINCESS also operated a voyage on the RUBY PRINCESS, from New Zealand to Australia. News reports suggest that in mid-to-late February, Defendants became aware of COVID-19 cases onboard the RUBY PRINCESS. Despite this information, CARNIVAL operated a second voyage on the RUBY PRINCESS, immediately following the New Zealand-to-Australia voyage. Since the vessel docked in Australia on March 19, 2020, over 600 passengers who were on the RUBY PRINCESS have tested positive for the virus and 10 have died. Australian authorities have announced a criminal investigation into the matter.

81.     To date, cruises run by CARNIVAL and PRINCESS have been identified as responsible for more than 1,600 positive COVID-19 infections, and over 50 deaths.

## III.    Carnival Undertook an Independent Duty of Care Toward Plaintiffs

82.     Through its public statements and conduct, Defendant CARNIVAL specifically undertook a duty to maintain a safe environment aboard the cruise ships in its fleet, including the M/V GRAND PRINCESS.

83.     For instance, CARNIVAL represented to its customers and the general public that it had a commitment to "[p]rotecting the health, safety and security of our passengers, guests, employees and all others working on our behalf, thereby promoting an organization that always strives to be free of injuries, illness and loss. … [and] assigning health, environment, safety, security (HESS) and sustainability matters the same priority as other critical business matters."[37] They

---

https://www.cdc.gov/media/releases/2020/s0218-update-diamond-princess.html (last visited April 6, 2020).

[37] Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, Carnival Health, Environment, Safety, Security & Sustainability Policy & Governance, https://www.carnivalcorp.com/leading-responsibly/health-environment-safety-security-sustainability-policy-governance/ (last visited April 7, 2020).

CLASS ACTION COMPLAINT

further assert that they "[s]upport a proactive framework of risk mitigation in the areas of HESS aimed at preventing, monitoring and responding to threats."[38]

84.    CARNIVAL promulgated HESS policies for all of its cruise line brands, including PRINCESS. CARNIVAL's HESS Corporate Policy, which is available to the public on CARNIVAL's website, states that CARNIVAL will "ensure compliance with this [HESS] policy within each of Carnival's Corporate and Operating Line organizations."[39]

85.    CARNIVAL knew, as explained in an article co-authored by its own Chief Medical Officer, Dr. Grant Tarling, that cruise ships "represent a potential source for introduction of novel or antigenically drifted influenza virus strains to the United States" and that cruise ship characteristics, such as "close quarters and prolonged contact among travelers on ships and during land-based tours before embarkation, increase the risk of communicable disease transmission."[40]

86.    The 2016 federal plea agreement noted that CARNIVAL "currently monitors and supervises environmental, safety, security, and regulatory requirements for Princess and other Carnival brands." Prior to the government investigation that led to the plea agreement, CARNIVAL had "undertaken steps to strengthen and enhance its oversight and compliance structure." For example, "the company initiated structural changes within its management organization, primary among which was the creation of a position titled 'Chief Maritime Officer,' placing the responsibility for overall environmental, safety, and security compliance in one individual …."

---

[38] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited September 30, , 2020).
[39] *Id.*
[40] Kimberly B. Rogers, MPH, Shahrokh Roohi, MPH, Timothy M. Uyeki, MD, *et al.*, *Laboratory-based respiratory virus surveillance pilot project on select cruise ships in Alaska, 2013-2015*, Journal of Travel Medicine 2017, 1-6, at 2 (2017).

CLASS ACTION COMPLAINT

87.     Given these assurances and representations, CARNIVAL undertook an independent duty to abide by its commitments and to protect passengers on all of its cruise lines, including PRINCESS, from reasonably-avoidable hazards, such as exposing passengers for a prolonged period of time on a ship known to be infested with a potentially-lethal virus.

## IV.     PRINCESS was an Apparent Agent of CARNIVAL

88.     CARNIVAL represented to the public that PRINCESS was its agent, causing passengers to justifiably rely upon the care and skill of PRINCESS to maintain a safe environment aboard the M/V GRAND PRINCESS.

89.     On its website, CARNIVAL prominently displays the PRINCESS name and logo, describing PRINCESS as part of its "family" of cruise line brands. CARNIVAL's website states that potential customers "need look no further than the Carnival family when selecting a cruise vacation."

90.     CARNIVAL promulgated HESS policies for all of its cruise line brands, including PRINCESS. CARNIVAL's HESS Corporate Policy, which is available to the public on CARNIVAL's website, states that CARNIVAL will "ensure compliance with this [HESS] policy *within each of Carnival's Corporate and Operating Line organizations*."[41]

91.     The web page on which CARNIVAL publicizes its HESS policy specifically identifies PRINCESS as a part of CARNIVAL CORPORATION and CARNIVAL PLC, representing that the policy applies to the subsidiary as well as the parent.

## V.     What Makes Cruise Ships Different From Other Businesses

92.     In some material respects, in the context of COVID-19 claims, common carriers like cruise ships undertaking custodial, long-haul, open-water

---

[41] Carnival Corporation & PLC Health, Environmental, Safety, Security, and Sustainability Corporate Policy, https://www.carnivalcorp.com/static-files/0b8327aa-c3be-4022-a1a5-a6dad7123af7 (last visited September 30, 2020) (emphasis added).

CLASS ACTION COMPLAINT

voyages present heightened risks to passengers that differ from other land-based businesses. With these heightened risks, as factual and legal matters, come additional attendant obligations on the owners and operators of cruise ships.

93.    As Defendants knew, cruise ships are particularly susceptible to rapid viral contagion because—unlike other businesses, such as restaurants, retail shops, and other consumer-facing businesses—after embarkation, passengers are effectively trapped onboard. PRINCESS and CARNIVAL had a custodial role over their passengers, who had no option for safe and fast exit while the vessel remained at sea.

94.    Cruise ships like M/V GRAND PRINCESS have a high population density, and the population is characterized by "relatively homogenous mixing"—meaning, there are a lot of people onboard, and they are all interacting with one another.[42]

95.    CARNIVAL and PRINCESS were and are well-aware of the fact that their crew members interact closely with passengers and often travel on multiple trips back-to-back, putting crew members into close contact with thousands of passengers in short periods of time. What's more, these crew members and the ship's passengers share a number of confined, public spaces—such as elevators and public restrooms—and interact with a myriad of shared, and frequently-touched surfaces, including but certainly not limited to the utensils used to serve food on buffet lines, elevator buttons, hand railings, chairs, cards and other game pieces, and door handles. The frequency with which individuals touch these surfaces along with the sheer number of people who come into contact with them in a limited

---

[42] J. Rocklov and H. Sjodin, COVID-19 outbreak on the Diamond Princess cruise ship: estimating the epidemic potential and effectiveness of public health countermeasures, Journal of Travel Medicine, Published February 28, 2020, https://academic.oup.com/jtm/article/27/3/taaa030/5766334 (last visited August 12, 2020).

CLASS ACTION COMPLAINT

period of time make cruise ships uniquely dangerous for the spread of viruses, including COVID-19.

96.     CARNIVAL and PRINCESS also understood, based on their years of specific experience operating cruise ships, the limited air flow and low ventilation in the interior of cruise ships, and they knew that these conditions make airborne viruses all the more hazardous on board a ship, particularly where passengers are exposed for a lengthy period of time during a long-haul, open-water voyage.

97.     Years before the COVID-19 outbreaks aboard the DIAMOND PRINCESS, RUBY PRINCESS, and M/V GRAND PRINCESS, CARNIVAL and PRINCESS's own Group Senior Vice President and Chief Medical Officer Grant Tarling, M.D., M.P.H. co-authored an article that acknowledged that cruise ships "represent a potential source for introduction of novel or antigenically drifted influenza virus strains to the United States" and that cruise ship characteristics, such as "close quarters and prolonged contact among travelers on ships and during land-based tours before embarkation, increase the risk of communicable disease transmission."[43]

98.     A study published on February 28, 2020, echoed Dr. Tarling's findings, and highlights the unique conditions of cruise ships that "amplified" the spread of COVID-19 among those onboard the Diamond Princess.[44] The study also revealed that extended periods of time on the ship without quarantine increased the spread of the virus.

---

[43] Kimberly B. Rogers, MPH, Shahrokh Roohi, MPH, Timothy M. Uyeki, MD, *et al.*, *Laboratory-based respiratory virus surveillance pilot project on select cruise ships in Alaska, 2013-2015*, Journal of Travel Medicine 2017, 1-6, at 2 (2017).

[44] J. Rocklov and H. Sjodin, *COVID-19 outbreak on the Diamond Princess cruise ship: estimating the epidemic potential and effectiveness of public health countermeasures*, Journal of Travel Medicine, Published February 28, 2020, https://academic.oup.com/jtm/article/27/3/taaa030/5766334 (last visited August 12, 2020).

CLASS ACTION COMPLAINT

99.   The combination of the aforementioned factors, among other factors, makes cruise ships distinctly susceptible to rapidly and pervasively spreading pathogens in ways that differ from most other businesses, which was well-known to Defendants.

**VI.   The February 11, 2020 M/V GRAND PRINCESS Cruise to Mexico**

100.   Despite their awareness of the unique risks created by the cruise ship environment, and their experiences with COVID-19 outbreaks on other vessels, on February 11, 2020, Defendants operated a roundtrip voyage from San Francisco to Mexico aboard the M/V GRAND PRINCESS. On or around February 19, 2020, Defendants became aware of at least one passenger suffering from COVID-19 symptoms onboard the M/V GRAND PRINCESS.

101.   According to PRINCESS's and CARNIVAL's Chief Medical Officer, Grant Tarling, MD, MPH, Defendants believed the infected passenger was already carrying the virus when he boarded the M/V GRAND PRINCESS on February 11, 2020.[45] Despite their knowledge regarding COVID-19, Defendants had no effective passenger medical screening methods in place at the time of boarding.

102.   Dr. Tarling reported that the infected passenger sought medical treatment from the medical center onboard the M/V GRAND PRINCESS on February 20, 2020. The passenger reported suffering from "acute respiratory distress" for about a week before seeking treatment. Upon information and belief, this information would have triggered mandatory reporting under 42 C.F.R. 71.1, *et seq.* and constitutes a "hazardous condition" per 33 C.F.R. § 160.216.[46]

---

[45] Thomas Fuller, John Eligon, and Jenny Gross, *Cruise Ship, Floating Symbol of America's Fear of Coronavirus, Docks in Oakland*, The New York Times, March 9, 2020, https://www.nytimes.com/2020/03/09/us/coronavirus-cruise-ship-oakland-grand-princess.html (last visited April 7, 2020).

[46] Section 160.216 requires that "[w]henever there is a hazardous condition … on board a vessel or caused by a vessel or its operation, the owner, agent, master, operator, or person in charge must immediately notify the nearest Coast Guard Sector Office . . . ." A "[h]azardous condition means any condition that may adversely affect the safety of any vessel … or the environmental quality of any port,

103.   Upon information and belief, at least three other passengers on the M/V GRAND PRINCESS's Mexico trip suffered from COVID-19 symptoms while on the vessel, likely exposing dozens of other passengers to the virus. At least 100 passengers who traveled on board the M/V GRAND PRINCESS have tested positive for COVID-19, and two passengers who traveled on the M/V GRAND PRINCESS's Mexico trip died after disembarking. One of these fatalities was the first-reported death caused by COVID-19 in California.[47]

104.   On February 21, 2020, the M/V GRAND PRINCESS arrived at port in San Francisco and some of the passengers from the Mexico trip disembarked.

105.   Approximately sixty-two passengers, at least two of whom were ill, and over 1,000 crew members remained onboard the M/V GRAND PRINCESS to continue traveling on the ship's next voyage, to Hawaii. Defendants did not implement any effective COVID-19 medical screening or examination procedures for crew or passengers who remained onboard and were continuing on for the Hawaii voyage.

106.   Defendants did not initiate effective measures to sanitize or disinfect the vessel in-between voyages, and did not implement any procedures for screening or testing existing or new passengers boarding the ship for the Hawaii-bound voyage.

---

harbor, or navigable waterway of the United States. It may, but need not, involve … injury *or illness of a person aboard* … ." 33 CFR § 160.202 (emphasis added).

[47] It has since been discovered that other Californians suffered from and died as a result of COVID-19 prior to the February 11, 2020 cruise aboard the M/V GRAND PRINCESS. Nevertheless the death of a Placer County resident who traveled on the M/V GRAND PRINCESS's February 11, 2020 cruise to Mexico spurred the state's initial stay-at-home orders. *See* Placer County Announces Death of Patient with COVID-19, March 4, 2020, https://www.placer.ca.gov/6438/Death-of-patient-with-COVID-19 (last visited May 19, 2020); Bill Chapel, *Coronavirus Deaths in Washington and California, Where Gov. Declares Emergency*, NPR, March 4, 2020, https://www.npr.org/sections/health-shots/2020/03/04/812121540/coronavirus-los-angeles-declares-emergency-and-u-s-reports-80-cases-in-13-states (last visited May 19, 2020).

CLASS ACTION COMPLAINT

107.   Defendants did not notify passengers who were scheduled to board the vessel on February 21, 2020, that passengers from the prior Mexico trip had reported COVID-19 symptoms, or of the fact that passengers remaining on board the M/V GRAND PRINCESS had been exposed to and might be infected with and/or carrying the virus. With the known likely presence of the virus in passengers and crew members who remained on the ship, the ship never should have sailed on to Hawaii.

**VII.   The February 21, 2020 M/V GRAND PRINCESS Voyage to Hawaii**

108.   On February 21, 2020, Plaintiffs embarked onto the M/V GRAND PRINCESS, and the ship departed the same day. The vessel sailed to Hawaii and made multiple stops on the Hawaiian Islands.

109.   Although PRINCESS and CARNIVAL had assured passengers that the trip would be safe and that PRINCESS and CARNIVAL would take measures, such as requiring temperature checks for those boarding the ship, in order prevent the presence of COVID-19 on the M/V GRAND PRINCESS, Defendants instituted no such effective measures. Plaintiffs and other passengers were not asked to check their temperatures, and were not subject to any medical screening upon boarding the ship other than a questionnaire that asked them if they had felt ill or recently traveled to China.

110.   On information and belief, on or about February 25, 2020, while Plaintiffs were in the midst of the Hawaii trip aboard the M/V GRAND PRINCESS, CARNIVAL and PRINCESS sent emails to passengers who disembarked from the San Francisco-to-Mexico trip on February 21, 2020. The email alerted the earlier passengers about their potential exposure to COVID-19 during their time on the cruise. No such notice was effectively provided to passengers who were onboard the ship on February 25, 2020.

111.   On February 29, 2020, the vessel left Hawaii.

CLASS ACTION COMPLAINT

112.   Upon information and belief, increased sanitary precautions did not begin onboard the M/V GRAND PRINCESS until on or about March 3, 2020.

113.   CARNIVAL and PRINCESS did not inform the passengers on board the M/V GRAND PRINCESS of COVID-19 cases in passengers who traveled on the ship's Mexico trip until March 4, 2020, when, early in the morning, the Plaintiffs and other members of the proposed Class received a health advisory. The advisory explained that the ship would no longer be traveling to Ensenada, Mexico, as originally scheduled. It would instead return directly to San Francisco. Further, the advisory alerted passengers to the investigation of a "small cluster of COVID-19 cases in Northern California connected to" the M/V GRAND PRINCESS's Mexico trip, and informed passengers of their potential exposure to the virus.

114.   Additionally, the advisory asserted that COVID-19 causes "mild illness in about 80% of cases," and that only "[a]bout 20% of people develop more severe symptoms."

115.   The March 4, 2020 health advisory suggested that passengers traveling on the Hawaii trip had already reported suffering from COVID-19 symptoms, and instructed other passengers who were experiencing or had at any time during the trip experienced symptoms "of acute respiratory illness with fever chills or cough" to immediately contact the ship's Medical Center. Finally, the advisory recommended that passengers wash their hands, use hand sanitizer, avoid contact with those suffering from respiratory illness, cover their noses and mouths when coughing and sneezing, and avoid touching their eyes and face. It did not make any recommendations for quarantine or social distancing measures. Nor did it call for passengers to wear masks.

116.   The March 4th health advisory was signed by Grant Tarling, MD, MPH , the Group Senior Vice President and Chief Medical Officer for PRINCESS and other CARNIVAL subsidiaries.

117.   Upon information and belief, individuals who had continued on to Hawaii from the prior leg of the cruise to and from Mexico began cabin-based quarantine for the first time on or around March 4, 2020. At that time, Defendants cancelled only large public gatherings, and continued hosting other events identified in the daily newsletter, the "Princess Patter," including Formal Night and its associated dinner.

118.   On information and belief, other CARNIVAL-owned cruise companies operated in a similar manner upon discovering that one or more of their passengers or crew members had exhibited COVID-19 symptoms. On the M/V DIAMOND PRINCESS, guests were encouraged to "mingle." And, on the M/S ZAANDAM (operated by Carnival subsidiary Holland America), after crew members and passengers reported suffering from COVID-19 symptoms, the ship's operators not only continued hosting large-scale events, but also instituted *additional* group activities to keep passengers occupied.

119.   Taken together, all the foregoing suggests a fact that can be confirmed and further developed through discovery:  that CARNIVAL directed the manner in which its subsidiaries, including PRINCESS, responded to COVID-19 outbreaks.

120.   Spurred by the COVID-19 outbreak on the M/V GRAND PRINCESS and the death of a passenger who had been on the Mexico trip, Governor Gavin Newsom declared a state of emergency in California on March 4, 2020, to manage the COVID-19 outbreak. As a result, the State of California refused to allow the vessel into port in San Francisco, forcing the vessel to anchor off the city's coast. Governor Newsom stated at a press conference that there were 11 passengers and 10 crew members on the ship who were experiencing symptoms.

121.   On or about Thursday, March 5, 2020, two weeks after the ship sailed from San Francisco harbor, Defendants instituted more operational changes, including cabin/state room quarantine, meal service to the cabins/state rooms by

CLASS ACTION COMPLAINT

placing trays in the hallway outside cabin doors, and cessation of daily turndown service and all communal activities.

122.   On or about March 7, 2020, Defendants announced through the ship's public address system that they had evacuated a critically-ill passenger by ship's tender and a U.S. Coast Guard cutter.

123.   On or about March 9, 2020, the ship was allowed to sail into and arrived in the San Francisco Bay escorted by the U.S. Coast Guard. The ship docked in the Port of Oakland and was met by ambulances and medical personnel. During the night, a CDC employee, in full hazmat gear, knocked on some cabin doors asking passengers if they had any symptoms.

124.   On or about March 10, 2020, passengers, including Plaintiffs, were finally allowed to disembark. Most passengers were shuttled to Travis Air Force Base in Solano County, California for further quarantine. Others were transported to Asilomar State Beach and Conference Grounds in Pacific Grove, or to other military bases, including Mira Mar in San Diego and Dobbins Air Force Base, in Georgia.

125.   A report from the CDC about the COVID-19 outbreak about the M/V GRAND PRINCESS found that "crew members were likely infected on voyage A and then transmitted [the virus] to passengers on voyage B" and that the ship "was an example of perpetuation of transmission from crew members across multiple consecutive voyages and the potential introduction of the virus to passengers and crew on other ships."[48]

126.   At the time of this filing, Defendant PRINCESS has cancelled future cruises embarking from San Francisco through May 14, 2021. However,

---

[48] L. Moriarty, et al., Public Health Responses to COVID-19 Outbreaks on Cruise Ships — Worldwide, February–March 2020, 69 Morbidity and Mortality Weekly Report 1, 1 (Mar. 23, 2020), https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6912e3-H.pdf (last visited Sept. 30, 2020).

CLASS ACTION COMPLAINT

PRINCESS's website indicates that it intends to resume operating certain cruise ships soon thereafter, potentially posing grave threats to their passengers, crew members, and the public health.[49]

127.   If Plaintiffs had known that they would be exposed to COVID-19, face the serious and actual risks of contracting or spreading COVID-19, and actually contract and suffer from COVID-19, while onboard the M/V GRAND PRINCESS, because, among other things, passengers from the M/V GRAND PRINCESS's San Francisco-to-Mexico trip had suffered from COVID-19 and / or that passengers exposed to COVID-19 on the Mexico trip remained onboard the M/V GRAND PRINCESS, Plaintiffs would not have sailed on the February 21, 2020, roundtrip voyage to Hawaii.

## VIII.   THE CDC'S DEFINITION OF A "PROBABLE CASE"

128.   In an April 5, 2020 position statement, the CDC and the Council of State and Territorial Epidemiologists ("CSTE") provided an "interim case definition" for COVID-19 for the purposes of counting and tracking "probable" and "confirmed" COVID-19 cases in the United States.[50]

129.   The interim definition provided three alternative clinical measures for evaluating a patient.

130.   First, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least two of the following symptoms are present:  fever (measured or subjective), chills, rigors, myalgia, headache, sore throat, or new olfactory and taste disorder(s).

---

[49] *See* Princess Cruises Extends Pause of Guest Cruise Vacations Through May 14, 2021, https://www.princess.com/news/news_releases/2021/01/princess-cruises-extends-pause-of-guest-cruise-vacations-through-may-14-2021.html (last visited February 9, 2021).

[50] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19) 2020 Interim Case Definition, Approved April 5, 2020, https://wwwn.cdc.gov/nndss/conditions/coronavirus-disease-2019-covid-19/case-definition/2020/ (last visited August 14, 2020).

CLASS ACTION COMPLAINT

131.   Second, a case meets the clinical criteria if there is no alternative more likely diagnosis and at least one of the following symptoms are present:  cough, shortness of breath, or difficulty breathing.

132.   Third, a case meets the clinical criteria if there is no alternative more likely diagnosis and a patient suffers from severe respiratory illness with at least one of either clinical or radiographic evidence of pneumonia or acute respiratory distress syndrome.

133.   The interim definition also provided that a case meets the laboratory criteria if there are positive results returned from a diagnostic test, an antigen test, or an antibody test.

134.   And, the CDC and CSTE identified a number of "epidemiological" criteria that should be considered when evaluating a potential COVID-19 case. Specifically, whether the patient was within 6 feet for 10 to 30 minutes or more with a person who has a confirmed or probable COVID-19 case; whether the patient was within 6 feet for 10 to 30 minutes or more with a person with a "clinically compatible illness" and some link exists to a confirmed COVID-19 case; whether the patient traveled to or resided in an area with sustained, ongoing community transmission of COVID-19; and/or whether the patient is a member of an at-risk cohort.

135.   Patients who meet both the clinical and epidemiological criteria are considered probable COVID-19 cases, as are those patients who presumptively meet the laboratory criteria and either the clinical or epidemiological criteria.

136.   The position statement also recognized that "field investigations will involve evaluations of persons with *no symptoms* and *these individuals will need to be counted as cases*."

137.   In addition to the above-listed clinical criteria, the CDC has published more up-to-date information regarding the range of symptoms created by COVID-19. This list, which the CDC concedes is not comprehensive, includes:

a.  Fever or chills

b.  Cough

c.  Shortness of breath or difficulty breathing

d.  Fatigue

e.  Muscle or body aches

f.  Headache

g.  New loss of taste or smell

h.  Sore throat

i.  Congestion or runny nose

j.  Nausea or vomiting

k.  Diarrhea[51]

## IX.   PLAINTIFFS' MEDICAL EXPERIENCES

138.   Plaintiffs were all exposed, in close proximity for extended periods of time, to individuals who were or were probably carrying COVID-19, including crew members onboard the M/V GRAND PRINCESS and their fellow passengers. Plaintiffs likewise effectively "resided in" for over two weeks a community—the cruise ship—that experienced sustained and ongoing transmission, as is evidenced by the vast numbers of passengers onboard the vessel who became ill with COVID-19. Plaintiffs also suffered symptoms consistent with the clinical criteria identified by the CDC and CSTE.

139.   Before boarding the M/V GRAND PRINCESS, Plaintiff TIMOTHY LEUENHAGEN was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside the United States in the two weeks prior to boarding.

---

[51] Center for Disease Control and Prevention, Symptoms of Coronavirus, Updated May 13, 2020 https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html# (last visited August 14, 2020).

CLASS ACTION COMPLAINT

1    140.   While onboard the M/V GRAND PRINCESS, TIMOTHY

2  LEUENHAGEN was exposed to COVID-19 when he attended events and activities

3  where he was in close proximity to numerous other passengers and crew members,

4  some of whom were infected with COVID-19.

5    141.   On or around March 13, 2020, while in quarantine at Marine Corps Air

6  Station Miramar in San Diego, California, TIMOTHY LEUENHAGEN tested

7  positive for COVID-19. He has since experienced persistent shortness of breath and

8  rapid heartbeat. Based on the timing of his positive test results, it is more likely

9  than not that TIMOTHY LEUENHAGEN contracted COVID-19 during the subject

10  voyage.

11    142.   Before boarding the M/V GRAND PRINCESS, Plaintiff NANCY

12  LEUENHAGEN was not exhibiting any symptoms of COVID-19 nor had she been

13  exposed to anyone who had been diagnosed with or who exhibited symptoms of

14  COVID-19. She had not travelled outside the United States in the two weeks prior

15  to boarding.

16    143.   While onboard the M/V GRAND PRINCESS, NANCY

17  LEUENHAGEN was exposed to COVID-19 when she attended events and

18  activities where she was in close proximity to numerous other passengers and crew

19  members, some of whom were infected with COVID-19.

20    144.   On or around March 15, 2020, NANCY LEUENHAGEN began to

21  suffer from a runny nose, dizziness, diarrhea, and a loss of taste and smell. She has

22  still not recovered her senses of taste and smell. In late April, 2020, she tested

23  positive for COVID-19 antibodies. Based on her positive test results, the timing of

24  the onset of her symptoms, and the CDC's definition of a "probable case" of

25  COVID-19, it is more likely than not that NANCY LEUENHAGEN contracted

26  COVID-19 during the subject voyage.

27    145.   Before boarding the M/V GRAND PRINCESS, Plaintiff JAMES

28  LEMAIRE was not exhibiting any symptoms of COVID-19 nor had he been

CLASS ACTION COMPLAINT

1    exposed to anyone who had been diagnosed with or who exhibited symptoms of
2    COVID-19. He had not travelled outside the United States in the two weeks prior to
3    boarding.

4        146.   While onboard the M/V GRAND PRINCESS, JAMES LEMAIRE was
5    exposed to COVID-19 when he attended events and activities where he was in close
6    proximity to numerous other passengers and crew members, some of whom were
7    infected with COVID-19.

8        147.   On or around February 27, 2020, JAMES LEMAIRE began
9    experiencing fatigue and a fever. Based on the timing of the onset of his symptoms
10   and the CDC's definition of a "probable case" of COVID-19, it is more likely than
11   not that JAMES LEMAIRE contracted COVID-19 during the subject voyage.

12       148.   Before boarding the M/V GRAND PRINCESS, Plaintiff HELGA
13   MYLES was not exhibiting any symptoms of COVID-19 nor had she been exposed
14   to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.
15   She had not travelled outside the United States in the two weeks prior to boarding.

16       149.   While onboard the M/V GRAND PRINCESS, HELGA MYLES was
17   exposed to COVID-19 when she attended events and activities where she was in
18   close proximity to numerous other passengers and crew members, some of whom
19   were infected with COVID-19.

20       150.   On or around February 27, 2020, HELGA MYLES began experiencing
21   fatigue and a persistent cough. She still experiences difficulty breathing. Based on
22   the timing of the onset of her symptoms and the CDC's definition of a "probable
23   case" of COVID-19, it is more likely than not that HELGA MYLES contracted
24   COVID-19 during the subject voyage.

25       151.   Before boarding the M/V GRAND PRINCESS, Plaintiff MARILYN
26   HAMILTON was not exhibiting any symptoms of COVID-19 nor had she been
27   exposed to anyone who had been diagnosed with or who exhibited symptoms of

28

CLASS ACTION COMPLAINT

1    COVID-19. She had not travelled outside the United States in the two weeks prior
2    to boarding.

3        152.   While onboard the M/V GRAND PRINCESS, MARILYN
4    HAMILTON was exposed to COVID-19 when she attended events and activities
5    where she was in close proximity to numerous other passengers and crew members,
6    some of whom were infected with COVID-19.

7        153.   On or around March 1, 2020, MARILYN HAMILTON began
8    experiencing a dry cough, headache, nausea, vomiting, diarrhea, headache, chills,
9    fatigue, and a loss of smell and taste. On or around March 22, 2020, while in
10   quarantine at Travis Air Force Base in Solano County, California, she tested
11   positive for COVID-19. Based on her positive test results, the timing of the onset of
12   her symptoms, and the CDC's definition of a "probable case" of COVID-19, it is
13   more likely than not that MARILYN HAMILTON contracted COVID-19 during
14   the subject voyage.

15       154.   Before boarding the M/V GRAND PRINCESS, Plaintiff CECELIA
16   BOGER was not exhibiting any symptoms of COVID-19 nor had she been exposed
17   to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.
18   She had not travelled outside the United States in the two weeks prior to boarding.

19       155.   While onboard the M/V GRAND PRINCESS, CECELIA BOGER was
20   exposed to COVID-19 when she attended events and activities where she was in
21   close proximity to numerous other passengers and crew members, some of whom
22   were infected with COVID-19.

23       156.   On or around February 24, 2020, CECELIA BOGER began to suffer
24   from a severe cough. Based on the timing of the onset of her symptoms and the
25   CDC's definition of a "probable case" of COVID-19, it is more likely than not that
26   CECELIA BOGER contracted COVID-19 during the subject voyage.

27       157.   Before boarding the M/V GRAND PRINCESS, Plaintiff TERRY
28   FRASER was not exhibiting any symptoms of COVID-19 nor had he been exposed

CLASS ACTION COMPLAINT

1   to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

2   He had not travelled outside North America in the two weeks prior to boarding.

3       158.   While onboard the M/V GRAND PRINCESS, TERRY FRASER was

4   exposed to COVID-19 when he attended events and activities where he was in close

5   proximity to numerous other passengers and crew members, some of whom were

6   infected with COVID-19.

7       159.   On or around March 1, 2020, TERRY FRASER began to suffer from

8   coughing and congestion. Based the timing of the onset of his symptoms and the

9   CDC's definition of a "probable case" of COVID-19, it is more likely than not that

10  TERRY FRASER contracted COVID-19 during the subject voyage.

11      160.   Before boarding the M/V GRAND PRINCESS, Plaintiff CYNTHIA

12  FRASER was not exhibiting any symptoms of COVID-19 nor had she been

13  exposed to anyone who had been diagnosed with or who exhibited symptoms of

14  COVID-19. She had not travelled outside North America in the two weeks prior to

15  boarding.

16      161.   While onboard the M/V GRAND PRINCESS, CYNTHIA FRASER

17  was exposed to COVID-19 when she attended events and activities where she was

18  in close proximity to numerous other passengers and crew members, some of whom

19  were infected with COVID-19.

20      162.   On or around March 1, 2020, CYNTHIA FRASER began to suffer

21  from coughing and congestion. Based on the timing of the onset of her symptoms

22  and the CDC's definition of a "probable case" of COVID-19, it is more likely than

23  not that CYNTHIA FRASER contracted COVID-19 during the subject voyage.

24      163.   Before boarding the M/V GRAND PRINCESS, Plaintiff JOAN

25  MCREE was not exhibiting any symptoms of COVID-19 nor had she been exposed

26  to anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

27  She had not travelled outside the United States in the two weeks prior to boarding.

28

CLASS ACTION COMPLAINT

164.   While onboard the M/V GRAND PRINCESS, JOAN MCREE was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crew members, some of whom were infected with COVID-19.

165.   On or around February 24, 2020, JOAN MCREE began to suffer from a severe cough, sometime coughing so much that her nose would bleed. She still has a lingering cough. Based on the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that JOAN MCREE contracted COVID-19 during the subject voyage.

166.   Before boarding the M/V GRAND PRINCESS, Plaintiff JORDAN LICHTENSTEIN was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside the United States in the two weeks prior to boarding.

167.   While onboard the M/V GRAND PRINCESS, JORDAN LICHTENSTEIN was exposed to COVID-19 when he attended events and activities where he was in close proximity to numerous other passengers and crew members, some of whom were infected with COVID-19.

168.   On or around March 3, 2020, JORDAN LICHTENSTEIN began experiencing congestion. On or around March 4, 2020, he developed a fever. On March 18, 2020, he tested positive for COVID-19. He spent twelve days in isolation at the University of California San Diego Medical Center before being transferred to his home outside of Chicago, Illinois via a chartered plane, because his illness made it impossible to travel on a commercial airline. Since then, JORDAN LICHTENSTEIN has experienced multiple blood clots, blockages of his carotid artery, and has had two strokes—all of which are due to his infection with COVID-19. His physicians have informed him that as a result of his COVID-19-related illness, he will require multiple surgeries. Additionally, he still cannot

CLASS ACTION COMPLAINT

swallow whole food and has been able to eat only pureed food. He is currently receiving therapy for his speech and swallowing. Based on his positive test results, the date of the onset of his symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that JORDAN LICHTENSTEIN contracted COVID-19 during the subject voyage.

169.   Before boarding the M/V GRAND PRINCESS, Plaintiff MARCIA LICHTENSTEIN was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside the United States in the two weeks prior to boarding.

170.   While onboard the M/V GRAND PRINCESS MARCIA LICHTENSTEIN was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crew members, some of whom were infected with COVID-19.

171.   On or around March 3, 2020, MARCIA LICHTENSTEIN began experiencing congestion and a cough. In the next few days, she began to suffer from a sore throat and head and body aches. On March 18, 2020, she tested positive for COVID-19. Based on her positive test results, the timing of the onset of his symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that MARCIA LICHTENSTEIN contracted COVID-19 during the subject voyage.

172.   Before boarding the M/V GRAND PRINCESS, Plaintiff J. LESLIE WARNER was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside the North America in the two weeks prior to boarding.

173.   While onboard the M/V GRAND PRINCESS J. LESLIE WARNER was exposed to COVID-19 when he attended events and activities where he was in

CLASS ACTION COMPLAINT

close proximity to numerous other passengers and crew members, some of whom were infected with COVID-19.

174.   On or around March 14, 2020, J. LESLIE WARNER began to suffer from a sore throat, a dry cough, fever, body aches, shortness of breath, and tightness in his chest. On March 15, 2020, he tested positive for COVID-19. Based on his positive test results, the timing of the onset of his symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that J. LESLIE WARNER contracted COVID-19 during the subject voyage.

175.   Before boarding the M/V GRAND PRINCESS, Plaintiff WENDY WARNER was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside the United States in the two weeks prior to boarding.

176.   While onboard the M/V GRAND PRINCESS, WENDY WARNER was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crew members, some of whom were infected with COVID-19.

177.   On or around March 7, 2020, WENDY WARNER began to suffer from headache, a dry cough, and tightness in her chest. Over the next few days, she developed a sore throat, runny nose, fatigue, body aches, and an upset stomach. On March 14, 2020, she tested positive for COVID-19. Based on the positive test results, the timing of the onset of her symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that WENDY WARNER contracted COVID-19 during the subject voyage.

178.   Before boarding the M/V GRAND PRINCESS, Plaintiff MICHAEL PIASECKI was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of

1  COVID-19. He had not travelled outside the United States in the two weeks prior to
2  boarding.

3     179.   While onboard the M/V GRAND PRINCESS, MICHAEL PIASECKI
4  was exposed to COVID-19 when he attended events and activities where he was in
5  close proximity to numerous other passengers and crew members, some of whom
6  were infected with COVID-19.

7     180.   On or around March 6, 2020, MICHAEL PIASECKI began to suffer
8  from a cough, headache, fever, chills, fatigue, and a loss of his sense of taste. On
9  May 16, 2020, he tested positive for COVID-19 antibodies. Based on his positive
10  test results, the timing of the onset of his symptoms, and the CDC's definition of a
11  "probable case" of COVID-19, it is more likely than not that MICHAEL
12  PIASECKI contracted COVID-19 during the subject voyage.

13     181.   Before boarding the M/V GRAND PRINCESS, Plaintiff BONNIE
14  PIASECKI was not exhibiting any symptoms of COVID-19 nor had she been
15  exposed to anyone who had been diagnosed with or who exhibited symptoms of
16  COVID-19. She had not travelled outside the United States in the two weeks prior
17  to boarding.

18     182.   While onboard the M/V GRAND PRINCESS, BONNIE PIASECKI
19  was exposed to COVID-19 when she attended events and activities where she was
20  in close proximity to numerous other passengers and crew members, some of whom
21  were infected with COVID-19.

22     183.   On or around March 5, 2020, BONNIE PIASECKI began to suffer
23  from a dry cough, headache, and fever. On May 16, 2020, she tested positive for
24  COVID-19 antibodies. Based on her positive test results, the timing of the onset of
25  her symptoms, and the CDC's definition of a "probable case" of COVID-19, it is
26  more likely than not that, it is more likely than not that BONNIE PIASECKI
27  contracted COVID-19 during the subject voyage.

28

CLASS ACTION COMPLAINT

184.   Before boarding the M/V GRAND PRINCESS, Plaintiff DAVID KNUDSEN was not exhibiting any symptoms of COVID-19 nor had he been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. He had not travelled outside the United States in the two weeks prior to boarding.

185.   While onboard the M/V GRAND PRINCESS, DAVID KNUDSEN was exposed to COVID-19 when he attended events and activities where he was in close proximity to numerous other passengers and crew members, some of whom were infected with COVID-19.

186.   On or around March 1, 2020, DAVID KNUDSEN began to suffer from a cough, headache, chills, fatigue, shortness of breath, and pain and pressure in his chest. On March 9, 2020, he tested positive for COVID-19 antibodies. Based on his positive test results, the timing of the onset of his symptoms, and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that DAVID KNUDSEN contracted COVID-19 during the subject voyage.

187.   Before boarding the M/V GRAND PRINCESS, Plaintiff CINDY KNUDSEN was not exhibiting any symptoms of COVID-19 nor had she been exposed to anyone who had been diagnosed with or who exhibited symptoms of COVID-19. She had not travelled outside the United States in the two weeks prior to boarding.

188.   While onboard the M/V GRAND PRINCESS, CINDY KNUDSEN was exposed to COVID-19 when she attended events and activities where she was in close proximity to numerous other passengers and crew members, some of whom were infected with COVID-19.

189.   On or around March 6, 2020, CINDY KNUDSEN began to suffer from a cough, headache, fatigue, nausea, congestion, sore throat, and a loss of her sense of taste and smell. Based on the timing of the onset of her symptoms and the CDC's definition of a "probable case" of COVID-19, it is more likely than not that,

CLASS ACTION COMPLAINT

1   it is more likely than not that CINDY KNUDSEN contracted COVID-19 during the

2   subject voyage.

3        190.   Before boarding the M/V GRAND PRINCESS, Plaintiff EDWARD

4   LAKE was not exhibiting any symptoms of COVID-19 nor had he been exposed to

5   anyone who had been diagnosed with or who exhibited symptoms of COVID-19.

6   He had not travelled outside the United States in the two weeks prior to boarding.

7        191.   While onboard the M/V GRAND PRINCESS, EDWARD LAKE was

8   exposed to COVID-19 when he attended events and activities where he was in close

9   proximity to numerous other passengers and crew members, some of whom were

10   infected with COVID-19.

11        192.   On or around March 16, 2020, while in quarantine at Marine Corps Air

12   Station Miramar in San Diego, California, EDWARD LAKE tested positive for

13   COVID-19. On or about March 17, 2020, EDWARD LAKE was transported by

14   ambulance from Miramar to the Intensive Care Unit at Scripps San Diego Hospital

15   due to a high fever, low oxygen, severe coughing, pneumonia, and weight loss. He

16   was released from the hospital on or about March 27, 2020 and continues to suffer

17   from fatigue, shortness of breath, and an inability to perform certain activities of

18   daily living.

19        193.   Based on the timing of his positive test results, it is more likely than

20   not that EDWARD LAKE contracted COVID-19 during the subject voyage.

21        194.   Before boarding the M/V GRAND PRINCESS, Plaintiff ELAINE

22   CARRIGAN was not exhibiting any symptoms of COVID-19 nor had she been

23   exposed to anyone who had been diagnosed with or who exhibited symptoms of

24   COVID-19. She had not travelled outside the United States in the two weeks prior

25   to boarding.

26        195.   While onboard the M/V GRAND PRINCESS, ELAINE CARRIGAN

27   was exposed to COVID-19 when he attended events and activities where he was in

28

CLASS ACTION COMPLAINT

close proximity to numerous other passengers and crew members, some of whom were infected with COVID-19.

196.   On or around March 16, 2020, while in quarantine at Marine Corps Air Station Miramar in San Diego, California, ELAINE CARRIGAN tested positive for COVID-19 and experienced weight loss and diarrhea.

197.   As a direct and proximate result of their negligence and gross negligence Defendants exposed Plaintiffs and Class Members to COVID-19, actual risk of immediate physical injury, and, in many cases, already-manifested actual physical injury. As a direct and proximate result of their exposure to COVID-19, Plaintiffs and Class Members have suffered physical injuries as described above, as well as emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame.

198.   In addition, Plaintiffs and Class Members were traumatized by their direct exposure to COVID-19, the risk that they would contract the virus, and the reasonable apprehension associated with that risk, as well as by their confinement on an infected vessel in isolation and for two weeks, on military bases, in some cases knowing that their friends and loved ones were suffering from, or could contract, a potentially lethal illness.

199.   Furthermore, as noted above, public health experts and physicians continue to learn more about the myriad ways COVID-19 attacks and damages the body, including long-lasting harms to the cardio-vascular system,[52] and to the

---

[52] Valentina O. Puntmann, et al., Outcomes of Cardiovascular Magnetic Resonance Imaging in Patients Recently Recovered From Coronavirus Disease 2019 (COVID-19), JAMA Cardiology, July 27, 2020, https://jamanetwork.com/journals/jamacardiology/fullarticle/2768916 (last visited August 12, 2020).

CLASS ACTION COMPLAINT

kidneys, liver, and neurological system, potentially even in "asymptomatic" patients.

200.   Plaintiffs and Class Members develop new and evolving medical concerns and uncertainties that require and will continue to require medical diagnostic exams. Plaintiffs and the Class Members are suffering and will continue to suffer due to the ever-present anxiety and reasonable apprehension that they will or may later experience negative health outcomes or complications as a direct and proximate result of being exposed to COVID-19 because of Defendants' negligent and grossly negligent acts and omissions.

201.   It is expected that, as a result of Defendants' negligence and gross negligence, they will continue to suffer and will, in the future, require medical services outside of the kinds accepted as part of the typical wear and tear of daily life.

## REQUEST FOR INJUNCTIVE RELIEF

202.   Plaintiffs traveled on the M/V GRAND PRINCESS, a cruise ship owned and operated by CARNIVAL and PRINCESS. In the future, Plaintiffs intend to go on cruises again, including cruises operated by Defendants.

203.   For passengers of the M/V GRAND PRINCESS during the COVID-infested cruises, including Plaintiffs, CARNIVAL and PRINCESS provided passengers a 100% "Future Cruise Credit," equal to the value that the passengers spent for the COVID-infested cruise, which credit must be used before March 31, 2021. If passengers do not use the credit for a CARNIVAL cruise by March 31, 2021, then the passenger forfeits the full value of the cruise. This underscores that CARNIVAL and PRINCESS fully expect that passengers, including Plaintiffs, will embark on a CARNIVAL/PRINCESS cruise in the near future.

204.   Without accurate and necessary information from CARNIVAL and PRINCESS regarding the risks of exposure onboard their vessel(s), recent exposure or potential exposure of passengers and crew members onboard their vessel(s), and

CLASS ACTION COMPLAINT

1    whether CARNIVAL and PRINCESS have any reason to believe that their

2    vessel(s) may be infested with COVID-19 or other communicable disease,

3    Plaintiffs will not be able to make informed decisions about whether it is safe to

4    travel on cruises operated by CARNIVAL and PRINCESS.

5          205.   Another critical concern for Plaintiffs, who plan to take cruises again

6    when they are able to do so, is whether they can rely on PRINCESS and

7    CARNIVAL to faithfully inform Plaintiffs and other future cruise passengers about

8    potential safety hazards, including and especially viral outbreaks, and whether

9    PRINCESS and CARNIVAL will take reasonable and necessary steps to protect

10   from and mitigate risks and harms associated with communicable diseases,

11   including COVID-19.

12         206.   This concern is especially acute for Plaintiffs here in light of the

13   multiple outbreaks experienced by passengers onboard vessels owned by

14   PRINCESS and CARNIVAL, including but not limited to the M/V GRAND

15   PRINCESS. Plaintiffs also expect that, absent an injunction, they will experience

16   future injury because CARNIVAL and PRINCESS previously asserted their

17   commitment to passengers' safety, well-being, and comfort and assured certain

18   Plaintiffs that they would institute particular screening measures, but then failed to

19   do so, and failed to take other effective measures to ensure that Plaintiffs were not

20   exposed to COVID-19.

21         207.   Moreover, CARNIVAL and PRINCESS's actions and omissions

22   exacerbated and hastened the spread of COVID-19 onboard the M/V GRAND

23   PRINCESS, exposing Plaintiffs to a potentially-lethal viral contagion.

24         208.   Plaintiffs face a real threat that, absent an injunction, they will be

25   subject to the same acts and omissions by CARNIVAL and PRINCESS that will

26   once again expose them to COVID-19 and/or other communicable disease that will

27   cause them injury and emotional harms.

28

CLASS ACTION COMPLAINT

209.  CARNIVAL's and PRINCESS's ongoing adherence to their HESS policy and their implementation of additional effective measures specifically to protect passengers from contracting COVID-19 is and will continue to be a substantial, necessary, and material factor in Plaintiffs taking future cruises. Without injunctive relief, Plaintiffs cannot be assured that CARNIVAL and PRINCESS will discharge their duty to Plaintiffs on future cruises and/or that they will abide by the representations and assurances that they have made to Plaintiffs, and Plaintiffs will once again suffer harms like those alleged in this Complaint.

**NOTICE**

210.  Section 16(A)(i) of the Passage Contract purports to require that claimants provide notice to PRINCESS and CARNIVAL of any potential claims. Although Plaintiffs do not concede that this provision is enforceable, Plaintiffs and Class Members have complied with this requirement by providing written notice to Defendants' electronically on June 25, 2020, and August 3, 2020.

**CLASS ACTION ALLEGATIONS**

211.  Plaintiffs bring this lawsuit as a class action on behalf of themselves and all similarly-situated persons pursuant to Federal Rules of Civil Procedure 23(a) and (b)(1), (b)(2), (b)(3), and/or (c)(4). This action satisfies the applicable numerosity, commonality, typicality, adequacy, predominance, and/or superiority requirements of those provisions.

212.  The proposed Class is defined as follows:  All persons in the United States, who sailed as passengers on the M/V GRAND PRINCESS cruise from San Francisco, California, leaving on February 21, 2020, roundtrip to Hawaii.

213.  Excluded from the proposed Class are: (1) CARNIVAL and PRINCESS, any entity or division in which either have a controlling interest, and its legal representatives, officers, directors, assigns and successors; (2) the judicial officer(s) to whom this case is assigned and the judicial officer(s)' immediate family and legal staff; and (3) governmental entities. Plaintiffs reserve the right to

1    amend the Class definition if discovery and further investigation reveal that the

2    Class should be expanded, otherwise divided into subclasses, or modified in any

3    other way.

4        214.   The individual Plaintiffs named in this complaint support the use of the

5    class action mechanism to achieve economy, efficiency, fairness and consistency of

6    result by determining the important common questions raised in this action on a

7    common basis.

8        A.    **Numerosity**

9        215.   There were, on information and belief, approximately 2,422

10   passengers on the M/V GRAND PRINCESS for the cruise that is the subject of this

11   action. Their exact number and identities can be readily ascertained from

12   Defendants' records. The individual joinder of all passengers is impractical, and the

13   class action procedure is more practical, cost-effective, inclusive, and efficient than

14   multiple lawsuits on the common questions of law and fact that unite the class, or

15   piecemeal and incomplete individual joinder. The disposition of the claims of these

16   Class Members in a single action will provide substantial benefits to all parties and

17   to the Court. Class Members are readily identifiable from information and records

18   in PRINCESS's possession, custody, or control, as well as from records kept by the

19   Department of Health and Human Services.

20       B.    **Typicality**

21       216.   The claims of Representative Plaintiffs are typical of the claims of

22   Class Members in that Plaintiffs, like all Class Members, sailed on the leg of the

23   M/V GRAND PRINCESS cruise that began on February 21, 2020. Plaintiffs, like

24   all Class Members, have been damaged by Defendants' misconduct in that they

25   sailed on a cruise they would not have sailed on and suffered significant injury,

26   emotional distress and economic damage, including medical monitoring, caused by

27   the negligence of the Defendants. The factual bases of CARNIVAL and

28

- 50 -

PRINCESS's misconduct are common to all Class Members and represent a common thread of misconduct resulting in injury to all Class Members.

### C.   Adequate Representation

217.   Representative Plaintiffs TIMOTHY LEUENHAGEN, NANCY LEUENHAGEN, JAMES LEMAIRE, HELGA MYLES, and MARILYN HAMILTON will fairly and adequately represent and protect the interests of the Class Members. Representative Plaintiffs TIMOTHY LEUENHAGEN, NANCY LEUENHAGEN, JAMES LEMAIRE, HELGA MYLES, and MARILYN HAMILTON have retained counsel with substantial experience in prosecuting class actions, aggregate suits, and mass torts.

218.   Representative Plaintiffs TIMOTHY LEUENHAGEN, NANCY LEUENHAGEN, JAMES LEMAIRE, HELGA MYLES, and MARILYN HAMILTON and their counsel are committed to vigorously prosecuting this action on behalf of all Class Members, and have the financial resources to do so. Neither Representative Plaintiffs TIMOTHY LEUENHAGEN, NANCY LEUENHAGEN, JAMES LEMAIRE, HELGA MYLES, and MARILYN HAMILTON nor their counsel have interests adverse to those of the Class Members.

### D.   Predominance of Common Issues

219.   There are numerous questions of law and fact, including those related to Defendants' knowledge, conduct, and duty throughout the events described in this Complaint, common to Plaintiffs and Class Members that predominate over any question affecting only individual Class Members, the answers to which will advance resolution of the litigation as to all Class Members. These common legal and factual issues include, *inter alia*:

a.   what Defendants knew about the presence and risks associated with the COVID-19 virus, and contagions generally, and when they knew it;

b.   whether Defendants should have canceled the subject cruise to avoid exposing passengers to a deadly pathogen and/or taken other steps to avoid

1    exposing passengers to a deadly pathogen, such as imposing social distancing

2    requirements, eliminating mass gatherings, and quarantining;

3            c.      whether Defendants had a duty to decontaminate the M/V

4    GRAND PRINCESS after they knew or should have known that individuals who

5    had been aboard the M/V GRAND PRINCESS prior to the subject cruise were or

6    were potentially carriers of the COVID-19 virus, and/or after it had been disclosed

7    prior to embarking on the subject leg of the cruise that passengers on the

8    DIAMOND PRINCESS had perished due to the COVID-19 virus;

9            d.      whether Defendants knew or should have known that passengers

10   and crew who had been aboard the M/V GRAND PRINCESS prior to the subject

11   cruise were exposed to or were potentially carriers of the COVID-19 virus;

12           e.      whether the fact that prior passengers and crew had been

13   exposed to or were potential carriers of the COVID-19 virus constitutes a material

14   fact reasonable consumers would have considered in deciding whether to embark

15   on the subject cruise;

16           f.      whether Defendants had a duty to disclose that passengers and

17   crew who had been aboard the M/V GRAND PRINCESS prior to the subject cruise

18   were exposed to or were potentially carriers of the COVID-19 virus, and other

19   relevant information;

20           g.      whether Defendants failed to disclose that passengers and crew

21   who had been aboard the M/V GRAND PRINCESS prior to the subject cruise were

22   or were potentially carriers of the COVID-19 virus and other relevant information;

23           h.      interpretation of the applicable contract documents and the

24   associated "Passenger Bill of Rights" incorporated therein;

25           i.      whether Defendants acted as alter egos and/or agents, such that

26   they should be held jointly liable for the conduct alleged herein;

27           j.      whether CARNIVAL is liable for the acts, omissions, and

28   violations described in this Complaint;

CLASS ACTION COMPLAINT

k.      whether PRINCESS is liable for the acts, omissions, and violations described in this Complaint; and

l.      whether the conduct of any or all of the defendants warrants the imposition of punitive damages to vindicate the societal interest in punishment and deterrence.

### E.      Superiority

220.   Plaintiffs and Class Members have all suffered and will continue to suffer harm and damages as a result of CARNIVAL's and PRINCESS's unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

221.   Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law. Because of the relatively small size of the individual Class Members' claims (compared to the cost of litigation), it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue without remedy.

222.   Class treatment of common questions of law and fact is superior to other available procedures, such as multiple individual actions or piecemeal litigation because class treatment will conserve the resources of the courts and the litigants, and will promote consistency and efficiency of adjudication.

### F.      Limited Fund

223.   In an abundance of caution, Plaintiffs take note of the presently apparent financial circumstances of CARNIVAL and/or PRINCESS to allege the possibility that their assets and resources available to fairly compensate Plaintiffs and Class Members, to satisfy appropriate punitive damages awards, and/or otherwise fairly address the claims against them may constitute a "limited fund" within the meaning of *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999), such that

CLASS ACTION COMPLAINT

class certification under Rule 23(b)(1)(B) is necessary and appropriate as a matter of due process and equity.

### G.     Mass Action

224.    In the alternative, this matter should proceed as a mass action, as defined in 28 U.S.C. § 1332 (d)(11)(B)(i) and should be tried jointly on the ground that plaintiffs' claims involve common questions of law or fact, including as set forth above.

225.    Plaintiffs' individual claims exceed the required jurisdictional amount of $75,000.00.

### CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### NEGLIGENCE AGAINST ALL DEFENDANTS

226.    Plaintiffs re-allege all allegations in paragraphs 1 through 225 as if alleged fully herein.

227.    Defendants CARNIVAL and PRINCESS owed Plaintiffs, and the Class, who were passengers who boarded the M/V GRAND PRINCESS on February 21, 2020 and who Defendants therefore had a custodial relationship over, a duty to ensure that they would not be exposed to an unreasonable risk of harm.

228.    CARNIVAL and PRINCESS held themselves out as committed to and responsible for ensuring the health and safety of their vessels and the passengers onboard those vessels—including the M/V GRAND PRINCESS. Plaintiffs and Class members took Defendants at their word and put themselves in Defendants' hands for the full duration of the voyage that is the subject of this Complaint. Plaintiffs and Class members relied on Defendants to ensure their security. Thus, Defendants owed Plaintiffs and the Class a duty to take actions to prevent and mitigate the risk of threats to passengers' health and safety, including by ensuring that the M/V GRAND PRINCESS was properly cleaned, disinfected, and safely maintained. Furthermore, Defendants owed Plaintiffs and Class members a duty to

CLASS ACTION COMPLAINT

1   not take actions that would exacerbate the spread and threat of COVID-19 onboard
2   the ship.

3       229.  Defendants knew or should have known the unique conditions aboard
4   cruise ships that create a particular risk of viral outbreak. Defendants knew or
5   should have known that cruise ships owned and operated by Defendants had been
6   the sites of prior, lethal outbreaks of COVID-19, and should have been aware of
7   new guidelines for the cruise industry published by Dr. Hadjichristodoulou and a
8   team of European experts on February 3, 2020. In particular, Defendants had
9   knowledge of the actual risks facing passengers based on the outbreak of the virus
10  on the DIAMOND PRINCESS a mere three weeks prior to the instant outbreak.

11      230.  Defendants knew or should have known that passengers traveling on
12  the M/V GRAND PRINCESS had suffered COVID-19 symptoms and that
13  passengers aboard the M/V GRAND PRINCESS's San Francisco-Mexico voyage
14  who remained onboard the vessel for the instant voyage were or could have been
15  exposed to and were or could have been carriers of the virus.

16      231.  Defendants knew or should have known that crew members aboard the
17  M/V GRAND PRINCESS were or could have been exposed to COVID-19 and
18  were or could have been carriers of the virus.

19      232.  Defendants failed to do what a reasonably careful cruise ship owner
20  and operator would do under the circumstances.

21      233.  Defendants breached their duty to Plaintiffs and the Class when, with
22  the aforementioned knowledge, Defendants nevertheless chose to embark on the
23  San Francisco-Hawaii voyage.

24      234.  Defendants also breached their duties when, with that same
25  knowledge, they chose not to screen or medically examine any passengers or crew,
26  including the approximately sixty-two passengers and over 1,000 crew members
27  who had traveled on the San Francisco-Mexico trip and were also traveling on the
28  San Francisco-Hawaii trip.

235.   Defendants further breached their duties to Plaintiffs and the Class when, with the above-mentioned knowledge, Defendants boarded, without additional decontamination and screening protocols, Plaintiffs and the Class onto the likely infested ship and negligently chose not to notify Plaintiffs and the Class of:  the actual risk that the ship was infested with COVID-19 due to prior passengers' infections; the actual and extreme risks of contracting COVID-19 while using facilities on the vessel; and/or the actual and extreme risks of contracting COVID-19 while interacting with passengers and crew who had traveled on the Mexico voyage.

236.   Additionally, Defendants breached their duties to Plaintiffs and the Class when, on or before February 25, 2020, Defendants repeatedly failed to notify passengers aboard the M/V GRAND PRINCESS during the San Francisco-Hawaii voyage that passengers on the Mexico voyage had been diagnosed with COVID-19, that one had died, and that certain passengers and crew from that trip remained onboard the M/V GRAND PRINCESS.

237.   If Defendants had adequately informed Plaintiffs and the Class prior to boarding, or at any other time, of the relevant information in Defendants' possession, including facts regarding the M/V GRAND PRINCESS, its prior passengers, continuing passengers and crew, lack of adequate screening, lack of adequate disinfecting procedures, lack of adequate quarantining procedures, and the actual risk of exposure, Plaintiffs and the Class could have made informed decisions about their health and their families' health, including disembarking from or not boarding the vessel.

238.   Defendants repeatedly breached their duties to Plaintiffs and the Class when, throughout the San Francisco-Hawaii voyage, with the aforementioned knowledge, they repeatedly chose not to inform Plaintiffs of the continuing and growing risks of contracting COVID-19, and chose not to provide Plaintiffs with the informed option to disembark at one of the vessel's ports of call.

239.   Finally, Defendants continued to breach their duties to Plaintiffs and the Class when, throughout the duration of the M/V GRAND PRINCESS's San Francisco-Hawaii voyage, with the aforementioned knowledge and without any warning to Plaintiffs and the Class, they, *inter alia*, chose not to implement quarantine or social distancing protocols; chose to continue operating large, public gatherings and meals; chose to continue to operate daily turndown service; and chose to continue hosting communal activities.

240.   As a direct and proximate result of Defendants' breach of their duties of care, Plaintiffs experienced COVID-19-associated symptoms as described above in paragraphs 138 through 201.

241.   As a direct and proximate result of PRINCESS's and CARNIVAL'S failure to safeguard Plaintiffs and the Class, and as a direct and proximate result of PRINCESS's and CARNIVAL's other acts and omissions as laid out herein, Plaintiffs were directly exposed to COVID-19 and to actual risk of immediate physical injury, Plaintiffs and the Class have suffered physical injury, emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame. They were traumatized by the reasonable apprehension of developing COVID-19. They were confined on an infected vessel in isolation and then were confined at Travis Air Force Base for two weeks. It is expected that they will continue to suffer and will, in the future, require medical services not of a kind generally anticipated as part of the effects of daily life.

**SECOND CAUSE OF ACTION**
**GROSS NEGLIGENCE AGAINST ALL DEFENDANTS**

242.   Plaintiffs re-allege all allegations in paragraphs 1 through 225 as if alleged fully herein.

243.   Defendants PRINCESS and CARNIVAL owed duties to Plaintiffs and the Class to:  safeguard against and mitigate the risks of passenger injury and illness; appropriately disinfect and sanitize the M/V GRAND PRINCESS, in light of the circumstances of a global pandemic; notify Plaintiffs and the Class of the actual and especially high risk of contracting COVID-19 aboard the M/V GRAND PRINCESS; disembark passengers and crew members who had likely come into contact with individuals infected with COVID-19; and implement medical screening and examination protocols for crew and passengers.

244.   Defendants knew of the unreasonably high risk of viral contagion of COVID-19 on cruise ships, and Defendants knew that it was especially dangerous to expose Plaintiffs and the rest of the Class to COVID-19 in light of the situation on the DIAMOND PRINCESS off the coast of Japan only three weeks prior.

245.   Defendants' conduct in deciding to continue to operate the M/V GRAND PRINCESS with Plaintiffs and the Class aboard, even with the aforementioned knowledge, demonstrates an intentional failure to do what a reasonably careful cruise ship owner and operator would do under the circumstances, exhibits a willful and conscious disregard for the safety of Plaintiffs and the Class, and evidences recklessness and indifference by Defendants, which constitutes gross negligence.

246.   Defendants' failure to abide by the guidelines issued on February 3, 2020, by not disembarking, on February 21, 2020, passengers known to have been in casual contact with individuals who reported COVID-19 symptoms constitutes a failure to provide even a modicum of care to Plaintiffs and the Class. Furthermore, the continued and repeated choice not to quarantine or otherwise shelter in their cabins the passengers and crew members who traveled on the San Francisco-Mexico voyage demonstrates a willful and conscious disregard for the rights and safety of others and amounts to an extreme departure of what a reasonably careful cruise ship owner and operator would do.

CLASS ACTION COMPLAINT

247.   Defendants' choice not to warn Plaintiffs and the Class of their actual risk of harm in being exposed to COVID-19, either prior to boarding or while they were already on board, in light of the prior passenger who came down with symptoms and later died, along with others from that prior voyage that exhibited symptoms, and the crew member who disembarked during this voyage due to COVID-19-related illness, constitutes a failure to provide even a modicum of care to Plaintiffs and the Class. The continued and repeated choice not to provide passengers with notice of the actual risks facing them demonstrates a willful and conscious disregard for the rights and safety of others and amounts to an extreme departure of what a reasonably careful cruise ship owner and/or operator would do.

248.   Moreover, Defendants' behavior demonstrated a willful and conscious disregard for the rights and safety of others, and an extreme departure of what a reasonably careful cruise ship owner and/or operator would do in their continued and repeated choices to:  not effectively sanitize and disinfect the M/V GRAND PRINCESS, either before or during the San Francisco-Hawaii voyage; not institute medical screening and examinations for passengers and crew members; host large social gatherings and meals; conduct daily turn-down service; and not implement quarantine or social distance protocols until March 5, 2020. These decisions manifest Defendants' utter failure to provide even a modicum of care to Plaintiffs and the Class.

249.   Defendants chose to place profits over people, including the safety of their passengers, crew, and the general public in continuing to operate business as usual, despite their knowledge of the actual—potentially lethal—risk to Plaintiffs and the Class.

250.   Indeed, as a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, Plaintiffs experienced COVID-19-associated symptoms as described in paragraphs 138 through 201.

251.   Finally, as a direct and proximate result of Defendants' gross negligence Plaintiffs and the Class were directly exposed to COVID-19, placed at actual, continual risk of immediate, and potentially fatal, physical injury. Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame. They were traumatized by the reasonable apprehension of developing COVID-19. They were confined on an infected vessel in isolation and then were confined at federal facilities, including Travis Air Force Base, for approximately two weeks. It is expected that they will continue to suffer and will, in the future, require medical services not of a kind generally accepted as a typical part of daily life.

### THIRD CAUSE OF ACTION
### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

252.   Plaintiffs re-allege all allegations in paragraphs 1 through 225 as if alleged fully herein.

253.   Defendants CARNIVAL and PRINCESS knew or should have known of the actual, unique risk of viral contagion of COVID-19 aboard cruise ships, and, in light of the situation on the DIAMOND PRINCESS only three weeks prior to the instant voyage on the M/V GRAND PRINCESS, Defendants knew or should have known that it was especially dangerous to expose Plaintiffs and the rest of the Class to COVID-19.

254.   Defendants also knew or should have known that passengers aboard the San Francisco-to-Mexico trip on the M/V GRAND PRINCESS had experienced symptoms of COVID-19 and were eventually diagnosed with COVID-19.

255.   Nevertheless, Defendants chose to board Plaintiffs and the Class onto the M/V GRAND PRINCESS on February 21, 2020 without instituting any procedures for medical screening or examination. Defendants then chose to embark

upon the Hawaii-bound voyage, essentially trapping Plaintiffs and the Class on a vessel infested with COVID-19, and likely exacerbated the spread of the virus aboard the ship. Throughout the duration of the trip, Defendants continually and repeatedly acted or failed to act in ways that caused Plaintiffs to be exposed to COVID-19, including but not limited to:  failing to take any effective actions to prevent or mitigate the spread of COVID-19 throughout the crew members and/or passengers; failing to alert passengers to the possibility of infection aboard the ship; and hosting and encouraging participation in large group activities and events that Defendants knew could lead to large-scale infection among the crew and passengers.

256.   These choices by Defendants created a dangerous and threatening environment in which Plaintiffs and the Class were forced to live for two weeks, at all times directly exposed to COVID-19 and at risk of becoming infected with, made ill by, and/or spreading COVID-19.

257.   As the direct and proximate result of Defendants' actions and omissions throughout the duration of their voyage aboard the M/V GRAND PRINCESS, Plaintiffs and members of the Class were in the "zone of danger," where they were directly exposed to a potentially-lethal virus, and placed at immediate risk of—and actually suffered—actual physical harm as a result of their direct and prolonged exposure to COVID-19.

258.   As a result of this exposure, which was directly and proximately caused by Defendants' acts and omissions, Plaintiffs and members of the Class experienced severe psychic injuries, of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, when they were forced to watch first hand as their friends and family members became ill with COVID-19, were concerned for their own safety and well-being, and continue to expect that they may begin exhibiting symptoms or health complications not yet

CLASS ACTION COMPLAINT

identified as a result of COVID-19. Plaintiffs suffered physical and emotional injury as the direct and proximate result of Defendants' misconduct.

259.   As a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, Plaintiffs experienced physical harms in the form of COVID-19-associated symptoms and negative health outcomes as described in paragraphs 138 through 201.

260.   Finally, as a direct and proximate result of Defendants' gross negligence, Plaintiffs and the Class were exposed to COVID-19 and threatened with serious physical injury. As a result, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation and shame related to their own risk of contracting COVID-19 and the suffering they witnessed among their fellow passengers who contracted COVID-19. Plaintiffs and members of the class were traumatized by the reasonable apprehension of their family members, friends and fellow passengers developing COVID-19 and by the threat to their own health of becoming infected with the virus or suffering future negative health outcomes or complications related to exposure to and/or contraction of the virus.

261.   Plaintiffs and Class members were endangered and harmed by Defendants' actions when they were forced into confinement on an infested vessel. That danger and harm continued when they were confined at federal facilities, including Travis Air Force Base, for approximately two weeks, as a result of the threat of viral outbreak created by Defendants' actions. It is expected that Plaintiffs and the Class will continue to suffer and will, in the future, require medical services not of a kind generally anticipated as a typical part of daily life.

**FOURTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

262.   Plaintiffs re-allege all allegations in paragraphs 1 through 225 as if alleged fully herein.

263.   CARNIVAL AND PRINCESS knew or should have known of unique conditions aboard cruise ships that render the risk of viral contagion especially dangerous and likely, and, based on their experience with COVID-19 aboard the DIAMOND PRINCESS only three weeks prior to the instant voyage on the M/V GRAND PRINCESS, Defendants knew or should have known that exposure to COVID-19 was threatening to passengers'—including Plaintiffs—lives and well-being.

264.   Defendants also knew or should have known that passengers aboard the San Francisco-to-Mexico trip on the M/V GRAND PRINCESS had experienced symptoms of COVID-19, were eventually diagnosed with COVID-19, and that those passengers remaining onboard for the Hawaii trip had been exposed and were likely carriers of the virus.

265.   By or before the time of boarding passengers onto the M/V GRAND PRINCESS, on February 21, 2020, Defendants knew or should have known of the extreme risks to health and safety—including the possibility of death—presented by COVID-19.

266.   In light of this knowledge and experience, and particularly given that, *first*, cruise ships present an especially heightened risk of contagion and, *second*, that once they have boarded, Passengers have no option of disembarking while the ship remains at sea, Defendants exhibited extreme and outrageous conduct when, *inter alia*, Defendants boarded Plaintiffs and the Class onto the M/V GRAND PRINCESS on February 21, 2020, for the Hawaii-bound trip without taking any effective measures to medically screen or examine passengers for COVID-19 symptoms.

267. Defendants additionally acted extremely and outrageously when they chose not to effectively clean, sanitize, sterilize, or disinfect the M/V GRAND PRINCESS in between the Mexico trip and the Hawaii trip. Furthermore, Defendants' decision to allow Plaintiffs and the Class to embark upon a voyage, on an ineffectively sanitized ship, with passengers and crew members who had been exposed to COVID-19 constituted extreme and outrageous conduct.

268. Defendants' decision to ignore recent protocols and recommendations issued by public health experts and experts in the cruise industry by not disembarking crew members and passengers who had been exposed to COVID-19 on the M/V GRAND PRINCESS's first voyage between San Francisco and Mexico was extreme and outrageous conduct.

269. Defendants exhibited repeated and continued extreme and outrageous conduct when, during the San Francisco-to-Hawaii voyage upon the M/V GRAND PRINCESS, prior to March 4, 2020, Defendants failed to: alert Plaintiffs to the fact that at least one passenger on the prior voyage had been diagnosed with COVID-19 and had come into contact with passengers and crew members currently on the ship; notify Plaintiffs and the Class about the actual and potential threat of exposure to, infection of, and the possibility of spreading, COVID-19 aboard the ship; failed to advise Plaintiffs and the Class about the possibility and health benefits of disembarking during the trip, at one of the vessel's ports of call.

270. Defendants continued to behave extremely and outrageously when they: encouraged Plaintiffs and the Class to continue mingling and participating in large group events and functions throughout the duration of the trip; continued to provide turn down service to passengers despite the fact that over 1,000 crew members had been exposed to COVID-19 on the Mexico trip; and failed to institute any policies for quarantine, isolation, or social distancing for passengers until March 4, 2020.

CLASS ACTION COMPLAINT

271.   The acts and omissions described herein not only failed to protect Plaintiffs from exposure to and contraction of COVID-19, but likely exacerbated the spread of the virus among the passengers, including Plaintiffs and the Class, ultimately enlarging the threat and harms to Plaintiffs and the Class.

272.   As a direct and proximate result of Defendants' intentional and reckless behavior and omissions, Plaintiffs and the Class suffered severe emotional distress and physical harm.

273.   Plaintiffs and the Class were forced to watch as their friends and family members became ill with COVID-19, and, all the while, know that their own safety and well-being were at extreme risk. Plaintiffs suffered physical and emotional injury as the direct and proximate result of Defendants' misconduct, and Plaintiffs continue to suffer from anxiety and the reasonable apprehension that they may still begin exhibiting symptoms or experience as-yet-unidentified complications due to their exposure to and potential contraction of COVID-19 while aboard the M/V GRAND PRINCESS.

274.   As a direct and proximate result of Defendants' extreme departure from the ordinary standard of care and their failure to meet their duties of care to Plaintiffs and the Class by providing even scant care, Plaintiffs experienced physical harms in the form of COVID-19-associated symptoms and negative health outcomes as described in paragraphs 169 through 201.

275.   Finally, as a direct and proximate result of Defendants' behavior, which exposed Plaintiffs and the Class to COVID-19 and to actual risk of immediate physical injury, Plaintiffs and the Class have suffered emotional distress of the nature and type that reasonable persons would suffer under the circumstances alleged in this Complaint, including, but not limited to, suffering, anguish, fright, horror, nervousness, grief, anxiety, worry, shock, humiliation, and shame related to their own exposure to COVID-19 and the suffering they witnessed among their fellow passengers who contracted COVID-19. Plaintiffs and members of the class

1  were traumatized by the reasonable apprehension of their family members, friends

2  and fellow passengers developing COVID-19 and by the past and ongoing threat to

3  their own health of becoming infected with the virus and potentially suffering from

4  as-yet-unidentified negative health outcomes and complications.

5      276.   Plaintiffs and Class members were endangered and harmed by

6  Defendants' actions when they were forced into confinement on an infected vessel

7  in isolation. That danger and harm continued when they were confined at federal

8  facilities, including Travis Air Force Base, for approximately two weeks, as a result

9  of the threat of viral outbreak created by Defendants' actions. It is expected that

10 Plaintiffs and the Class will continue to suffer and will, in the future, require

11 medical services not of a kind generally accepted as part of the wear and tear of

12 daily life.

13     277.   Throughout the events described in this Complaint, Defendants

14 repeatedly acted with conscious, callous, and/or reckless disregard for the rights,

15 interests, health and safety of their passengers, such that the imposition of punitive

16 damages, under CA Civil Code Section 3294 and/or all other applicable law, is

17 necessary and appropriate to punish them for their course of conduct, and to deter

18 them and others, and protect the public, from the consequences of similar conduct.

19                              **PRAYER FOR RELIEF**

20     WHEREFORE, Plaintiffs, on behalf of themselves, and all others similarly

21 situated, pray for judgment against Defendants, and each of them, as follows:

22     1.      An order certifying the proposed Class pursuant to Fed. R. Civ. P. Rule

23 23(a) and (b)(1), (b)(2), (b)(3) and/or (c)(4), designating Plaintiffs TIMOTHY

24 LEUENHAGEN, NANCY LEUENHAGEN, JAMES LEMAIRE, HELGA

25 MYLES, and MARILYN HAMILTON as named representatives of the Class and

26 designating the undersigned as Class Counsel;

27     2.      An award of damages totaling in excess of Five Million Dollars

28 ($5,000,000.00), inclusive of compensatory damages for Plaintiffs' injuries, including

CLASS ACTION COMPLAINT

1  emotional pain and suffering and any other damages allowed by law, in an amount to

2  be proven at trial;

3      3.      An award of the costs associated with the ongoing medical monitoring

4  and diagnostic examinations required to diagnose, prevent, and/or treat current or

5  future injury related to Plaintiffs' and Class Members' exposure to, illness and disease

6  caused by, and contraction , asymptomatic contraction, and/or potential contraction of

7  COVID-19, in light of the evolving scientific understanding of the full risk and scope

8  of health outcomes related to and / or resulting from the virus;

9      4.      An injunction requiring Defendants to: disclose to future passengers the

10  nature and rate of risk of communicable disease upon their cruise ships; implement

11  disinfecting and sanitizing procedures on each of their ships in between and during

12  voyages; implement appropriate social distancing and physical distancing protocols to

13  avoid or reduce the transmission of communicable pathogens; disembark and

14  quarantine passengers when Defendants become aware of a heightened risk of

15  communicable disease aboard a ship; and canceling or discontinuing the operation of

16  cruises when Defendants know or should know of a potential deadly pathogen or

17  similar aboard their ships;

18      5.      An award of attorneys' fees and costs, as allowed by law;

19      6.      An award of pre-judgment and post-judgment interest, as provided by

20  law;

21      7.      Leave to amend this Complaint to conform to the evidence produced at

22  trial; and

23      8.      For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

25      Plaintiffs hereby demand a jury trial as provided by Rule 38(a) of the Federal

26  Rules of Civil Procedure.

27

28

CLASS ACTION COMPLAINT

Respectfully submitted,

Dated:      February 9, 2021          NELSON & FRAENKEL LLP


By:  */s/ Gretchen M. Nelson*

Gretchen M. Nelson (112566)
gnelson@nflawfirm.com
Carlos F. Llinás Negret (284746)
cllinas@nflawfirm.com
601 So. Figueroa Street, Suite 2050
Los Angeles, CA 90017
Telephone:  213-622-6469
Facsimile:  213-622-6019


Dated:      February 9, 2021          MARY ALEXANDER & ASSOCIATES, P.C.


By:  */s/ Mary E. Alexander*

Mary E. Alexander, Esq. (SBN 104173)
*malexander@maryalexanderlaw.com*
Brendan D.S. Way, Esq. (SBN 261705)
*bway@maryalexanderlaw.com*
44 Montgomery Street, Suite 1303
San Francisco, California 94104
Telephone: (415) 433-4440
Facsimile: (415) 433-5440

CLASS ACTION COMPLAINT

1

Dated:     February 9, 2021          **LIEFF CABRASER HEIMANN &**
                                     **BERNSTEIN, LLP**

2

3

4                                    By:   */s/ Elizabeth J. Cabraser*

5                                    Elizabeth J. Cabraser (SBN 083151)
                                     *ecabraser@lchb.com*
                                     Jonathan D. Selbin (SBN 170222)
6                                    *jselbin@lchb.com*
                                     275 Battery Street, 29th Floor
7                                    San Francisco, CA 94111-3339
                                     Telephone: (415) 956-1000
8                                    Facsimile: (415) 956-1008

9                                    **LIEFF CABRASER HEIMANN &**
                                     **BERNSTEIN, LLP**
10                                   Mark P. Chalos (*Pro Hac Vice Forthcoming*)
                                     *mchalos@lchb.com*
11                                   Christopher E. Coleman (*Pro Hac Vice*
                                     *Forthcoming*)
12                                   *ccoleman@lchb.com*
                                     222 2nd Avenue South, Suite 1640
13                                   Nashville, TN 37201
                                     Telephone: (615) 313-9000
14                                   Facsimile: (212) 313-9965

15                                   Joseph G. Sauder
                                     Lori G. Kier
16                                   **SAUDER SCHELKOPF LLC**
                                     1109 Lancaster Avenue
17                                   Berwyn, PA 19312
                                     Tel: (610) 200-0581
18                                   Facsimile: (610) 421-1326
                                     jgs@sstriallawyers.com
19                                   lgk@sstriallawyers.com

20                                   *Attorneys for all Plaintiffs*

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT